liCOOKS, Judge.
Defendants, Hugh R. Goodrich, Thomas E. Berry and Priscilla G. Rea, own mineral, royalty and leasehold working interests in the Bayou Postillion Field in Iberia Parish, Louisiana, and in other fields in Louisiana and Texas. Defendants and plaintiff, Exxon Corporation, are parties to a Joint Operating Contract (JOC), dated January 1, 1956. The JOC governed the operation of the Bayou Postillion Field. Exxon served as operator under the JOC until December 31, 1991, when it transferred operations to a third party.
*18 The JOC provided Exxon, as operator, would charge the joint account for royalties it paid on behalf of defendants as non-operators. Exxon was required to bill defendants each month for their proportionate share of the 12Costs and expenses. Further, Exxon agreed to send defendants detailed statements of the monthly charges and any credits due them summarized by appropriate classifications identifying the nature of the entries.
In January 1993, Exxon filed suit seeking to recover alleged overpayments tendered by it to defendants relating to the operation of Sand Units G and H at the Bayou Postillion Field. The suit involves three claims brought by Exxon. The trial court’s judgment addressed each claim separately. Exxon appealed the judgment on one claim, and defendants appealed the judgment on the other two claims. For clarity, we will discuss the claims separately, providing the factual basis for each as necessary.
I.
Accounting Error Claim — February 1983 through April 1984.
Exxon routinely sold its share of natural gas produced from the Bayou Postillion Field to its wholly-owned subsidiary, Monte-rey Gas Pipeline Company. Prior to 1977, Exxon also sold, on defendants’ behalf, their share of the gas to Monterey, paying out of the proceeds the royalties defendants owed to lessors and remitting the balance to them. In 1977, however, defendants opted to sell their share of gas by contracting directly with a third-party purchaser. They executed a Gas Purchase Agreement with Louisiana Intrastate Gas (LIG) to sell their share of the Bayou Postillion Field production. Defendants designated Exxon as their representative in the LIG contract to receive the proceeds of the sale and to make appropriate distributions and payments. From the sale proceeds, Exxon paid royalties owed to lessors on defendants’ interest in the Field production and remitted the balance to defendants.
UThis arrangement continued, without a glitch, until February 1983. In that month, LIG began reducing the amount of natural gas it purchased from defendants. As a result, defendants were selling less than their proportionate share of the Bayou Postillion Field production; and, as a further consequence, they were in an “underproduced” position as defined in a Gas Balancing Agreement also executed by the parties.[1]
Exxon continued to provide monthly statements to defendants, reflecting the actual sale of gas to LIG in the reduced volume. According to Exxon, these statements additionally indicated that the volume remaining was allocated to defendants. This balance, Exxon’s representatives testified at trial, was designated as “stored,” in accordance with the Gas Balancing Agreement and the JOC. As explained, the gas was not actually “stored” in containers; rather it was allotted on paper to defendants in kind for future sale. Although the monthly statements provided by Exxon to defendants reflected they were in an “underproduced” position, Exxon asserts it continued to pay defendants “mistakenly ... as though [it] was selling their entire proportionate share of the Bayou Postillion gas to LIG each month” for several months between 1983 and 1984. The error went unnoticed until July 1984 when Exxon claims it “was notified by Monterey Pipeline Company that defendants had obtained a release from their LIG contract and that they had entered into a short-term sales contract with Monterey Pipeline for the gas which was previously committed to LIG but |4which LIG did not purchase.” According to Exxon, defendants then proceeded to “make up” the stored gas allotted to them in kind pursuant to the Gas Balancing Agreement “out of Exxon’s share of the gas and sold it to Monterey Pipeline” at a lower sale price than that originally contracted with LIG *19 “until the imbalance among the parties was eradicated.” Exxon’s representatives testified since the company had already mistakenly paid defendants the full LIG price for the “stored” gas later sold to Monterey, the company invoiced defendants for the difference between the LIG price and the actual price Monterey paid for the “stored” gas, which equaled “$69,628.65.” To offset this “overpayment,” Exxon began deducting the amount from the remittitur it would customarily tender to defendants, as their representative (after payment of royalties to third parties) from subsequent sales to Monterey Pipeline. Exxon was unable to recoup the full amount, however, because defendants’ short-term contract with Monterey ended. Exxon forwarded an invoice to defendants for $32,433.55, representing the unrecouped portion of the overpayment.
There is little disagreement that Louisiana’s case law provides that Exxon, under the circumstances alleged by it, is entitled ordinarily to recover the overpayment by offset or compensation from defendants’ gas revenues. See Arkla, Inc. v. Maddox & May Bros. Casing Serv. Inc., 28,081 (La.App. 2 Cir. 4/3/96); 671 So.2d 1220. But circumstances that are obvious to one party seldom appear the same to the other, particularly when a contractual dispute results in litigation.
Defendants’ version of what they allege “actually” transpired during the relevant period does not dovetail with Exxon’s recollection of the circumstances. In fact, defendants insist Exxon’s story is entirely fabricated and ^motivated by desire to profit, unfairly, at their expense. They maintain “[i]n February of 1983, when LIG began curtailing its purchases, Exxon simply resumed selling Defendants’ share of production” to Monterey and, after paying royalties to third parties, it remitted the balance to them. They insist the claimed monthly overpayments by Exxon were nothing more than remittitur due them. To buttress thefr position, defendants direct our attention to Article VI of the JOC which provides in the event:
Non-Operator does not elect to receive in kind or otherwise dispose of its proportionate share of such production, Operator shall be entitled to purchase such share or to market such share on a day to day basis. In such event, Operator shall account monthly for the proceeds of such production....
(Emphasis ours)
They argue this provision clearly “authorizes and empowers the operator to market a non-operator’s share of production and to account to the non-operator for the proceeds of the sales of such production.” They point out for many years, in accord with the referenced Article, Exxon sold defendants gas interest to Monterey and accounted to them monthly for the proceeds. This practice, defendants assert, Exxon recommenced for fifteen months until they decided to deal directly with Monterey.
Defendants allege further Exxon’s “recollection” of the events when it discovered the so-called error was an “after thought” manufactured on the advice of Monterey to retroactively take advantage of a precipitous decline in gas prices during the period they were in an underproduced position. They allege, on discovering they contracted with Monterey to sell their share of production for a price lower than they originally contracted with LIG because of market forces, Exxon changed on paper its initial election to sell the gas to 16Monterey on defendants’ behalf. Instead, Exxon entered the preceding transactions as “stored” or allocated gas on defendants’ behalf, and “[w]ith the [same] stroke of [a] pen” it changed what was actually remittitur to them for earlier sales to Monte-rey, all in accord with the JOC, to “overpay-ments”; thus, creating a significant claim against them to benefit from the declining gas prices.
Defendants acknowledge during the period they were in an underproduced position, the JOC allowed Exxon “to sell [their] share of production for its own account, subject to [their] right to ‘make up’ these volumes ... at a later date” or to sell the gas on their behalf. They argue what the JOC and Gas Balancing Agreement did not authorize was “Exxon changing its election” once it opted to sell the gas on their behalf “after the fact to [its] advantage and [their] detriment.”
*20 But Exxon maintains defendant suffered no detriment from the “stroke of [its] pen” and their account of what occurred “ignores the fact that [their] gas was committed to the LIG contract and that absent a contractual release from LIG, neither defendants nor Exxon were [sic] permitted to sell [the remaining] gas to another gas purchaser.”
To support its position, Exxon also directs our attention to Article VI of the JOC. Exxon argues the provision defendants referenced, as noted above, “authorizes or empowers” an operator to purchase or market a non-operator’s share of gas only “[i]n the event [the][n]on-[o]perator does not elect to receive in kind or otherwise dispose of its proportionate share of such production.” As noted by Exxon, the operator’s option mentioned in this provision must yield to the “right” of the non-operator expressed as follows in the preceding paragraph:
|7Eaeh party hereto shall have the right at any time and from time to time to receive in kind or to sell and deliver to any person its proportionate share of the oil, gas or other minerals produced from the Joint Area. Operator shall deliver Non-Operator’s share of such production into the pipe line, storage tank, or other facility maintained by such Non-Operator or by any third person designated by such Non-Operator.
When defendants contracted with LIG, Exxon asserts, they exercised their right to receive in kind or to sell and deliver their proportionate share of the gas produced from the field to a third-party purchaser. Exxon insists it was powerless, once defendants exercised their right, to purchase or market their share of gas without a release from LIG. Even defendants’ conduct, Exxon argues, suggests they were “fully aware that their Bayou Postillion gas was committed to the LIG contract and that it was not being marketed by Exxon under the JOC.” This is, Exxon urges, “precisely why the defendants negotiated a release from LIG of the gas LIG was not purchasing” before entering a short-term contract with Monterey to sell the gas LIG did not purchase.
As mentioned, Exxon’s first notice that defendants had obtained such a release occurred in July, 1984 when it received a letter from Monterey Pipeline Company so informing it. Exxon maintains the sale of defendants’ gas to Monterey occurred thereafter, and only thereafter; and, the invoices in evidence fully prove that Monterey paid a lower price for the gas than originally contracted by LIG.
The trial judge apparently accepted Exxon’s version of the facts and circumstances; a determination, which we find, was not manifestly erroneous. To rebut the strength of Exxon’s evidence, defendants offered only ^“accusations and suspicions.” Their reliance on Article VI of the JOC as documentary “proof positive” that Exxon actually sold the “remaining” gas share which LIG did not purchase at a higher price to Monterey and later “doctored up” its books is an offering which does not support the “truth” of their assertion. The monthly statements provided to defendants, long before this dispute surfaced, support Exxon’s assertion that it allocated the unsold volume of gas production to defendants. Exxon further urges, persuasively, that Article VI of the JOC only allowed it to purchase or sell defendants’ share of the gas production if, and only if, they failed to exercise their right to take in kind or sell the gas to a third-party purchaser. Defendants do not deny the existence of the LIG contract. Although LIG reduced the volume of gas it purchased from defendants each month during the relevant period, nothing in the record suggests that this company could not purchase the remaining volume at a later date in full or part. We are mindful that the contract between defendants and LIG permitted them to “reserve ... such quantities of gas as [they] may [have elected] to take from time to time, up to but not in excess of fifty percent (50%) of [their] Delivery Capacity as it exists from time to time.” However, defendants offered “no proof’ that they provided written or other notice to LIG of them intent to reserve or caused to be sold to Monterey by Exxon any quantity of gas during the relevant period. Though this option was available to them, they did not exercise it and Exxon was powerless to exercise it for them. Exxon, as an operator, could not market gas which defendants had *21 already obligated themselves to deliver to LIG. Further, defendants acknowledge in a letter dated July 27, 1984, and addressed to Exxon that the volume of gas “not taken by LIG” during the period in question exceeded 50% of their monthly delivery |9capacity. Yet, they insist Exxon sold the entire “remaining balance” each month to Monterey; though, neither they nor Exxon had authority to do so without breaching the LIG contract. If they believed in earnest that they or Exxon could have sold the remaining gas without notifying LIG, why then did they request “after the fact” that LIG release its “call on any volumes not purchased”? The inconsistencies of defendants’ argument, if not patent, are discernible without much deliberation. Nothing in this record contradicts the findings of the trial judge; and, as appellate judges, we are prevented from substituting defendants’ unsupported version of the facts and circumstances for those the trial judge found were true and more credible.
II.
Royalty Reimbursement Claim — July 1986 through December 1991
This claim arises from defendants’ ownership of leasehold working interests in the Bayou Postillion Field. Article XIV of the JOC addresses payment of royalties:
Each of the parties hereto shall bear its proportionate part of the one-eighth royalty due on any production of the leases described on “exhibit A”, insofar as they affect the Joint area. If any of such leases are burdened with any royalties ... the party or parties contributing such lease shall bear and assume such portion thereof as may be over and above the one-eighth royalty, out of the interest attributable to such party or parties hereunder.
Operator shall pay for the parties hereto all royalties ... and Goodrich and Cocke authorize Operator to withhold, each month, a sufficient sum of money to cover all such royalty payments due on its interest in production hereunder during the preceding month, and to furnish Operator with complete information upon which Operator may base royalty payments for each such Non-Operator hereunder. | ^(Emphasis supplied.)
Exxon contends pursuant to its contractual obligation, it paid royalties owed by defendants each month based on their production interest in the Field. Exxon then billed defendants for the royalties it paid on their behalf, as provided in the JOC. Exxon maintained defendants have not reimbursed it for the royalties it paid on their behalf from 1986 to 1991. Defendants refused to pay Exxon’s invoices, arguing they should not have to reimburse Exxon for royalties it paid on their behalf in months where they had no gas sales. Defendants point out beginning in 1986 and ending at the close of 1988, and at intermittent times thereafter, they had no market for their gas.
The trial court held the JOC requires both parties in this litigation to bear their proportionate part of the royalty due on any production from the leases and that defendants were obligated to pay royalties on a monthly basis whether they actually sold their production in a particular month or not. Our review of the record supports the trial court’s finding. Defendants’ argument that they are relieved of their obligation to pay royalties because they did not sell their production in a given month is contrary to the provisions of the JOC. Even defendants’ “landman,” Jeanette Wilkins, admitted as much, when she testified:
Q: And royalties are paid on the production from the wells; aren’t they under this agreement?
A: On production, that’s what it says.
Q: It doesn’t say anywhere in this agreement that royalties are paid on sales volumes; does it, ma'am?
A: This agreement doesn’t anticipate separate sales, so it doesn’t address it. This is a rather old form of agreement, 1956, and so the concept of 1 nseparate sales was not familiar at that time.
Q: The agreement doesn’t have any provisions that royalties will be paid on sales, does it ma'am?
A: But if you don’t sell your gas, do you have production? Do you own the production? You own what’s in the ground; be *22 cause, it hasn’t been — it hasn’t been produced.
Q: Does the royalty provision — The royalty provision does not provide that royalties will be paid on sales; does it? It provides royalties will be paid on production.
A: This Operating Agreement doesn’t at this time.
Q: This Operating Agreement does have a take in time provision; does it not, ma'am?
A: Yes; it does.
Q: And that would provide for the separate sales of the working interest owners of them gas?
A: Yes.
Q: So the agreement does contemplate separate sales by the working interest owners of their gas, doesn’t it?
A: I guess you could say that. Yes.
Defendants also contend the trial court erred in finding Exxon proved, through competent evidence, the amount of their al- ■ leged royalty obligation and in admitting as evidence the report and opinions of Exxon’s expert, Bill Hill. They insist that as plaintiff, Exxon had the burden of proving every element of its case by a preponderance of the evidence. We note there is no dispute Exxon paid royalties on defendants’ behalf. Only the amount of royalties paid is disputed; an amount defendants claim Exxon has not proved certain because the record does not contain copies of the recorded leases | ^existing between defendants and all affected mineral lessors.
Exxon furnished defendants with documents entitled Summaries of Royalty Invoices, showing how the royalty invoices were computed. As the trial judge noted in his reasons for judgment, some of the summaries did not match the amounts shown on the invoices. Defendants paid a portion of the sums claimed, but the balance remained in dispute. The parties continued to “hash-over” the amounts billed until April 23, 1992, when Exxon provided defendants a complete month by month breakdown of the amounts it paid extending from July 1986 through December 1991. The amounts in this statement differed from the amounts shown on the summaries previously issued to defendants by Exxon. Exxon also entered into evidence computer generated accounting records, maintained by it, containing the name of each royalty owner, their percentage interest and the amount of the payment made each month to the royalty owners.
At trial Exxon also produced the calculations of Bill Hill, a certified professional land-man, who agreed Exxon was entitled to reimbursement for royalties paid in the following amounts:
Hugh Goodrich $115,855.85
Thomas Berry $ 59,773.71
Priscilla G. Rea $ 30,387.30
Hill testified he relied on Exxon’s Gas Division of Interest records, the- oil and gas leases, the JOC and various title agreements located in Exxon’s land records. He stated these are the records customarily relied upon by landmen in calculating royalty payments. Although many of the documents relied upon by Hill were introduced into evidence, all were not. However, Louisiana Code of Evidence article 703 provides:
| isThe facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
We find the trial court did not err in considering the calculation of royalties prepared by Bill Hill. Defendants complain Hill previously worked for them, and as such his testimony for Exxon created a conflict of interest. In weighing the testimony and evidence adduced on the royalty reimbursement claim, the trial court considered Hill’s alleged lack of loyalty to the defendants. The court weighed Hill’s credibility as well as the credibility of the other witnesses and found Hill’s amounts were accurate.
The trial court gave the following reasons for accepting the calculations of Hill:
Defendants contend that absent the introduction into evidence of over 16,000 can *23 celed checks issued to and negotiated by the appropriate 250 royalty owners in the Bayou Postillion Field over the six (6) years in question that plaintiff can not prove the payment of royalties. This Court disagrees with that contention. Proof of payment may be established by business records other than canceled checks. Theus, Grisham, Davis and Leigh v. Dedman, 401 So.2d 1231 (La.App. 2nd Cir.1981).
This Court finds that defendants are obligated to reimburse plaintiff for past paid royalties in the following amounts less any payments made by the defendants:
Hugh Goodrich —$115,855.85
Thomas Berry —$ 59,773.71
Priscilla G. Rea —$ 30,387.30
This finding is based on preponderance of evidence submitted to the Court. Of great significance to this Court was Defendants’ failure to offer evidence that Mr. Hill’s calculations were in | terror or that Exxon did not pay royalties on their behalf. To the contrary, defendants’ land-man testified that it was her understanding that Exxon paid royalties on behalf of the defendants; that she had no reason to believe that Exxon did not pay defendants’ royalties; and that none of the defendants’ royalty owners had complained of non-payment or improper payment of royalties during the period 1986 through 1991.
After a thorough review of the record, we do not find the trial court manifestly erred in accepting Hill’s calculations, particularly considering defendants’ failure to produce countervailing evidence. Exxon’s evidence at minimum served as prima facie proof that it had a reasonable basis to believe the amounts paid as royalties on defendants’ behalf were owed to the mineral lessors possessing leasehold interests in defendants’ share of the Bayou Postillion Field. At this stage, defendants had the opportunity to rebut Exxon’s prima facie evidence. Surely, defendants possessed copies of all the leases they now contend Exxon should have been compelled to present. They had available to them “the best evidence” to refute Exxon’s calculations; yet, they opted to “say or do” nothing. Left unrebutted, the trial judge ultimately found the admitted evidence preponderated in Exxon’s favor..
III.
The Interest Question
In January 1989 defendants began selling their share of the Bayou Postillion Field production to Cordell Resources Company. Defendants received the sales proceeds directly from Cordell. For a ten-month period Exxon, by mistake, also paid for the gas defendants were selling to Cor-dell. Exxon informed defendants of the double payments and in May 1990 invoiced them for the mistaken payments. Defendants did not reimburse Exxon, 115contending they were not furnished with the necessary data to verify the amount of the incorrect payments. Defendants maintain they were not able to verify the correct amount until they were provided with a detailed statement on March 13, 1997. Prior to trial, however, the amount owed for the double payments was stipulated to by the parties.
The trial court found the accounting provisions of the JOC mandated that the unpaid balances owed by defendants to Exxon bear interest at the rate of 6% per annum; and, the court awarded Exxon interest on its “double payment” claim at the contractual rate beginning fifteen days after March 13, 1997, the date defendants received detailed statements from Exxon. The trial judge also awarded Exxon the contractual rate on its “overpayment” claim.
Exxon urges the trial court erred in awarding interest at the rate provided for in the JOC on the claims. It argues these were erroneous payments made for things not due and, therefore, are subject to legal interest as provided by Article 2924 of the Louisiana Civil Code. We do not agree.
Responding to defendants’ accounting error and royalty reimbursement claims, discussed earlier in this opinion, Exxon relied heavily upon the JOC provisions, insisting it required us to affirm the judgment of the trial court. However, Exxon now asks us to ignore the JOC provisions controlling the rate of interest in this instance. The errone *24 ous payments were revenues due from defendants’ interest in the Bayou Postillion Field. Therefore, the JOC governs the actions of the parties. La.Civ.Code art.2000 provides in part:
When the object of the performance is a sum | ífípf money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by Article 2924.
(Emphasis ours.)
Article I, Sections 2 and 3 of the JOC provide, in pertinent part, as follows:
2. Statements and Billings
Operator shall bill Non-Operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding month. Such bills will be accompanied by statements, reflecting the total costs and charges as set forth under Subparagraph C below:
‡ ‡ $
C. Statements as follows:
(1) Detailed statement of material ordinarily considered controllable by operators of oil and gas properties;
(2) Statement of ordinary charges and credits to the joint account summarized by appropriate classifications indicative of the nature thereof; and
(3) Detailed statement of any other charges and credits.
3. Payments by Non-Operator
Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six percent (6%) per annum until paid.
The trial judge specifically found defendants were not provided with the necessary bills accompanied by detailed statements as required above until March 13, 1997. The JOC covers this eventuality and provides interest should not begin running until fifteen days after this date.
Exxon also urges defendants were in bad faith in not reimbursing them for the double payments for almost seven years. We find this argument is |i7without merit. The record does not indicate defendants were in bad faith. To the contrary, it shows a great deal of confusion on both sides concerning the overpayments tendered by Exxon. Clearly, the double payments were solely the fault of Exxon. In fact, although the double payments first occurred in 1989, Exxon did not discover them until 1991. The trial court specifically held defendants did not receive the information necessary to verify the over-payments until March 13, 1997. Immediately, upon receiving this information, defendants stipulated to the amount owed.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed equally between Exxon and defendants.
AFFIRMED.

. In such agreements various owners of a well, unit or lease typically set forth the manner in which production will be balanced among them in the event one or more of them take more or less than his allocable share of production. A party who is selling less than its full proportionate share of the gas is referred to as an “under-produced party,’’ and that party is entitled to take such additional quantities of gas as may be necessary to offset any previous disproportionate deliveries by the other parties.