**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**11-22**


**STATE OF LOUISIANA**

**VERSUS**

**SHAWN SHELTON**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO.13,322
HONORABLE ERIC R. HARRINGTON, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


**SYLVIA R. COOKS**
**JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Sylvia R. Cooks, J. David Painter, and James T. Genovese, Judges.


**CONVICTION AFFIRMED**


Van H. Kyzar, District Attorney
P,O, Box 838
Natchitoches, LA   71458-0838
(318) 357-2214
Counsel For State of Louisiana

Louisiana Appellate Project
G. Paul Marx
P.O. Box 82389
Lafayette, LA   70598
(337) 237-2537

Shawn Shelton
#557994 La. State Penitentiary
D.R./CCR E-7
Angola, LA   70712
Pro Se

**COOKS, Judge.**

## PROCEDURAL HISTORY

On August 15, 2007, a grand jury indicted Shawn Shelton (Shelton), charging him with the second degree murder of Justin James (James) on October 30, 2005. The indictment alleged the murder was committed during the perpetration or attempted perpetration of forcible rape. Shelton pled not guilty on November 17, 2008. An amended indictment/bill of information was filed on February 5, 2010, revising the charge to manslaughter, a violation of La.R.S. 14:31(A)(2)(a).

The jury convicted Shelton of manslaughter on March 19, 2010. He was previously convicted in Nevada for the kidnapping and sexual assault of a fourteen-year-old boy, and was serving a sentence of thirty-five years to life in prison. Shelton committed this crime during the investigation of James' homicide. The trial court sentenced Shelton to thirty years at hard labor on June 23, 2010, to run consecutively to the Nevada sentence. Shelton appeals his conviction. We affirm.

## FACTS

On October 29, 2005, the victim, James, and his friend, Justin Wise (Wise), were drinking beer and watching television at the home of the victim's sister's boyfriend, about a 45-minute drive from Natchitoches. Two other friends, Josh Collins (Collins) and Brent McDaniel (McDaniel), called and asked James and Wise to come to their apartment in Natchitoches. The victim and Wise left for Natchitoches around 9:30 or 10:00 p.m.

The young men visited on the balcony of the third-floor apartment for two or three hours and saw Shelton at the apartment complex. According to Wise, Shelton said he had flown in from Hollywood, and someone had stolen his black

Hummer vehicle. Collins, however, testified that Shelton told them he was waiting for a friend to return with the Hummer. McDaniel recalled people at the apartment complex gathered around a black Hummer. This was the same vehicle owned by Shelton in which Nevada police found cameras, and photos of young males, nude from the waist down. Some of the photos were taken inside Shelton's Hummer.

When it "got kind of late," Wise went inside and went to sleep on the couch, while James remained on the balcony of the third-floor apartment. At some point, James woke Wise and told him that Shelton had invited him to come down to his apartment; he asked if Wise wanted to go. Wise declined, and at 3:35 a.m. on October 30, 2005, the victim called Collins's cell phone from a number Shelton identified in a written statement as his. Collins told the victim to come up to his apartment, and he then went to sleep. James never returned to Collins' apartment.

During the early morning hours, James sent several messages to the telephone of his sister, Destiny James (Destiny), from an AOL account. Although Destiny believed the messages were received around 4:00 a.m. to around 6:00 a.m., a printout of the messages introduced into evidence showed they were sent from 2:01 a.m. to 4:26 a.m. The messages indicated James had met "a pretty cool dude" named Shawn Shelton who was a producer for a movie company. The messages were sent from Shelton's computer.

Contrary to his representations to James, Shelton was no movie producer. Kirk Kepper (Kepper), a movie producer, actor, and principal in Skinny Giraffe Productions, filming a movie in Natchitoches at the time of the victims' death, testified. According to Kepper, Shelton was originally hired for security work associated with the movie, and then worked as a runner and production assistant. Kepper told him he would have the "vanity title" of assistant producer when the movie was released. He further testified that Shelton had not been employed with

Kepper for approximately three weeks to a month prior to his meeting James on October 29, 2005.

The record reveals Shelton was anything but a "cool dude" or movie producer. Shelton was a former California police officer convicted of sexually assaulting a fourteen-year-old boy in Nevada while the current charge was pending. He was later convicted and is serving a thirty-five year to life sentence in prison. Shelton used subterfuge to lure the young boy in Nevada to accompany him. In that episode, Shelton posed as a law enforcement officer investigating a crime. Shelton used a Polaroid camera to take pictures of the Nevada boy as part of his scheme to sexually assault him. Other photos of young men nude from the waist down were found in Shelton's possession in his black Hummer. These young men appear to be in drug induced states while being sexually assaulted.

Kepper was driving Shelton's black Hummer to Natchitoches on October 30, 2005 after staying overnight in Lafayette with the Hummer when he received a call from one of Shelton's roommates, saying something was wrong at the apartment. Apparently the roommate was unable to make a 911 call and "was kind of freaked out." Kepper was then successful in calling 911.

Randy Williams of the Natchitoches Police Department was dispatched to the Frog Pond Apartments in response to the 911 call. Upon arrival at Shelton's apartment, he saw the victim, nude from the waist down, wearing only two t-shirts, lying on the floor with his legs inside a bedroom and the rest of his body extending into the living room. Shelton appeared to be performing CPR on him. Williams noticed a brownish substance in front of the closet in the bedroom with a blanket on top of part of it, and he saw drag marks on the floor leading from Shelton's bed to where the body was lying in the doorway. He testified it appeared to him that someone made an effort to clean the scene and hide the substance on the floor.

3

James arrived dead at the hospital. He died as the result of ingesting lethal quantities of morphine and cocaine allegedly distributed or dispensed to him by Shelton. Williams testified that he observed the victim's body at the hospital while it was being examined by the assistant coroner. He observed that there was a shiny substance on the victim's rectum and that his rectum appeared "opened". He further testified that the victim's "rear end" was "very clean," which he found very odd, considering that in his experience when a person dies their bowels empty and, as he stated, "that's not the part you want to look at." In his experience, the area was too clean under the circumstances.

Detective Corporal Jayson Linebaugh of the Natchitoches Police Department also responded to the call. He took a statement from Shelton in which he claimed he woke up and saw the victim on the floor. He claimed the victim did not respond when he tried to wake him, and that the victim vomited when he tried to rouse him. Testimony at trial established that a brown substance, which appeared to be the victim's vomit, was observed on the pillow case, comforter, and afghan in Shelton's room. Shelton further stated that earlier in the evening, the victim asked if Shelton had a computer to email his sister. Shelton claimed he went to bed, but the victim kept coming in throughout the night, using the computer while he slept. According to Shelton, when he found James, he was not breathing, and he tried to revive him with CPR.

Linebaugh testified that it looked like someone had unsuccessfully tried to clean the brown stain on the carpet in the bedroom and that he too observed smear marks "like it had been ground down into the carpet."

Testimony by James' sister and friends established that James was not a drug user and had not used drugs in their presence on the day he died. They also testified that James was not a homosexual and to their knowledge did not engage in

homosexual activity. To their knowledge James was only interested sexually in females.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. We have discovered one error patent on the face of the record. The trial court imposed sentence immediately after denying the Motion for Post-Verdict Judgment of Acquittal and the Motion for New Trial without waiting the required twenty-four hour period and without a waiver from the defendant, contrary to the provisions of La.Code Crim.P. art. 873.

The sentencing hearing was held almost three months after the jury rendered its verdict. Shelton filed a sentencing memorandum. He also filed his motions for acquittal and new trial ahead of the hearing and, on the morning of the hearing, filed a Motion for Continuance. After hearing arguments the motions for acquittal and new trial were denied. Shelton's Motion for Continuance was then heard and was also denied. It was based upon his assertions that he needed more time to review certain documents in the pre-sentence investigation report to address certain alleged discrepancies. After the denial of the continuance, both sides worked out the alleged discrepancies in the report and the hearing proceeded. Shelton did not object to proceeding with the sentencing hearing and did not mention the twenty-four hour delay time period. Shelton submitted evidence and argument in favor of mitigating his sentence. His attorney orally objected to the sentence imposed as excessive, but neither Shelton in his *pro se* brief, nor his appellate counsel, have raised excessive sentence as an assignment of error nor has either raised the issue of the failure of the court to wait twenty-four hours after the denial of the motions for acquittal and for new trial.

The trial court did not expressly ask if defendant was ready to proceed with sentencing and defense counsel did not make any expression which might be considered an express waiver of the twenty-four hour waiting period. We have, however, previously held that in the absence of an express waiver there can be an implied waiver by the defendant. In examining this record we find there was an implied waiver. This case is much like *State v. Taves*, 02-709 (La.App. 3 Cir. 1/15/03), 846 So.2d 1, *affirmed in part, reversed in part on other grounds*, 03-518 (La. 12/3/03), 861 So.2d 144. As in *Taves*, defense counsel in this case was well aware that sentencing would be taken up at the scheduled hearing after the court heard his motions for acquittal and new trial. As we discussed above, the motion for continuance was based on the desire to have more time to review the pre-sentence investigation report and did not make any mention of the twenty-four hour requirement as a basis for a continuance. Also, as in *Taves*, defense counsel declared his intent to introduce evidence at the sentencing hearing and was successful in clearing up some alleged discrepancies in the pre-sentence investigation report. He also argued for leniency and presented what he considered mitigating factors. Likewise, as in *Taves*, Shelton does not "raise as error the trial court's failure to delay sentencing and did not allege prejudice." *Id*. at 1252. In *Taves*, we did find the sentence excessive but that finding was reversed by the Louisiana Supreme Court. As we noted in *State v. Giles*, 04-359 (La.App. 3 Cir. 10/6/04), 884 So.2d 1233, *writ denied*, 04-2756 (La.3/11/05), 896 So.2d 62, in the *Taves* case "the supreme court reversed this court's finding of excessiveness and reinstated the sentences without any mention of the trial court's failure to abide by the delay required by La.Code. Crim.P. art. 873." We find there was an implied waiver of the twenty-four hour waiting period and further find that Shelton makes no argument claiming prejudice resulting from the failure to delay sentencing for

6

the required twenty-four hour period. As Shelton suffered no prejudice and impliedly waived his right to the twenty-four hour delay, the error patent is harmless.

**ASSIGNMENT OF ERROR NO. 1**

Shelton argues the Amended Indictment/Bill of Information was defective in that it failed to specify a particular offense and instead listed multiple possible offenses and did not allege any specific facts or specify his conduct which formed the basis of the indictment. He argues the Bill of Information should have been quashed. Initially, Shelton was indicted by a grand jury on a charge of second degree murder. The State, on its own initiative, amended the Indictment to a charge of manslaughter. Shelton never filed a Motion to Quash but filed a motion attempting to compel the state to elect and state a single offense on which to proceed. The trial court denied that motion finding the state is not compelled to choose a single theory to proceed. Because he failed to file a Motion to Quash, Shelton cannot raise this issue for the first time on appeal. *See State v. Gainey*, 376 So.2d 1240 (La.1979). Despite this procedural bar, however, we recognize that the state constitution does provide that an accused must be informed of the nature and cause of the accusations against him. La.Const. Art. 1, Section 13. These requirements are embodied in the Louisiana Code of Criminal Procedure Articles 464 and 465. A review of the record shows that even if Shelton had properly filed a motion to quash, the state more than adequately complied with the requirements. The Amended Indictment/Bill of Information specifically cited the manslaughter statute and listed every predicate offense the state alleged might be applicable. Shelton was well-informed of the crime with which he was being charged and the specific nature of the underlying offenses which the state maintained were applicable. There was extensive pre-trial discovery in the case and Shelton points

to nothing which would demonstrate he was confused or did not understand the basis of the charge against him or the alleged grounds upon which the state based the charges for which he was being tried. This assignment is without merit.

**ASSIGNMENT OF ERROR NO. 2 and *PRO SE* ASSIGNMENTS OF ERROR ONE THROUGH FIVE**

Shelton alleges his constitutional right to due process was violated because the State presented no evidence of his act or intent regarding a homicide, "ignored its own investigation and concocted an absurd and insupportable theory," and misled the jury by confusion and inadmissible other crimes evidence. In his *pro se* brief, he argues proof of the crimes of manslaughter, simple rape or attempted simple rape, sexual battery or attempted sexual battery, or possession or distribution of Schedules II and IV dangerous substances was never established, and the circumstantial evidence against him insufficiently proved no reasonable hypothesis of innocence.

First, he argues the victim's friends should not have been allowed to testify that he did not use drugs and was not a homosexual. Shelton never objected to that testimony at trial and, therefore, may not raise it now for the first time on appeal. La.Code Crim.P. art. 841.

The gist of the remainder of Shelton's argument in these assignments of error is that the evidence was insufficient to convict him because the State did not show a rape or sexual assault was perpetrated or attempted on the victim and did not directly relate the drugs found in the victim's body to Shelton. He also asserts in his *pro se* assignment of error number two that the State made improper remarks in its opening statement in violation of La.Code Crim.P. arts. 766-769. He asserts the State falsely stated in opening that he was a flunky and not a producer as he had

8

told James. Testimony at trial from Kepper supports the prosecution's conclusion. There is no merit to this assignment of error.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007), citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521, (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

It is the factfinder's role to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most

9

favorable to the prosecution.'"*McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

Nevertheless, it is not the function of the appellate court to reassess credibility of witnesses or reweigh the evidence:

[The supreme court has] repeatedly cautioned that the due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder only to the extent necessary to guarantee the fundamental protection of due process of law.

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted).

The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

Manslaughter under La.R.S. 14:31(A)(2)(a) is "[a] homicide committed, without any intent to cause death or great bodily harm . . . [w]hen the offender is

10

engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person. . . ." The State contended Shelton committed a homicide by distributing or dispensing morphine, cocaine, and alprazolam to James for the purpose of raping him.

Randy Williams of the Natchitoches Police Department testified the victim was found nude from the waist down wearing only two t-shirts when the officer arrived at the apartment. He saw the body at the hospital right after the victim was pronounced dead. The assistant coroner for Natchitoches Parish turned the victim on his side, exposing his rectum. Williams saw "some kind of substance there and his rear end was opened." He testified the substance was shiny, "almost like uh, Vaseline or something to that effect."

James Parker, an investigator for the coroner's office, also examined the body at the hospital on October 30, 2005. He, too, saw a viscous, glistening substance on the skin surface around the anus that he felt might be a lubricant but he did not collect a sample of the glistening substance. He did not notice anything abnormal regarding the appearance of the rectum.

Kelly Raley, qualified as an expert in forensic DNA analysis, testified she had tested the penile, oral, and rectal swabs taken during the victim's autopsy. She found the victim's DNA in a sperm cell on the penile swab and prostate specific antigen (PSA) from an unknown donor on the rectal swab. According to Raley, PSA is found in male urine and seminal fluid. Raley explained that it is not scientifically possible to determine whether the PSA was the victim's or from another person.

Defendant presented Dr. Richard Kamm (Dr. Kamm) of the Line Avenue Clinic in Shreveport as an expert in anatomic pathology and clinical pathology.

11

Dr. Kamm was first contacted regarding this case by the Natchitoches Parish District Attorney's office. Correspondence from the District Attorney's office furnished Dr. Kamm with the report of death, certificate of death, the Natchitoches Parish EMS ambulance run report with statements and coroner's notes, the drug screen report of the Natchitoches Parish Hospital, the autopsy report, and the St. Louis University Toxicology laboratory report which indicated particular interest in what the toxicology results showed "as to time and quantities of drugs ingested."

Dr. Kamm, based on these documents, testified the victim's blood screen was positive for morphine, an opiate; alprazolam, a drug from the benzodiazepine family; cocaine; cocaine metabolites; and Lidocaine. He believed the Lidocaine was administered during resuscitation attempts. An unknown number of Lortab, an opiate, and Restoril, a drug in the benzodiazepine family, were missing from Shelton's prescription bottles for those medications. Additionally, cocaine metabolites indicated alcohol was in the victim's bloodstream at the time the cocaine was ingested. The presence of multiple breakdown products indicated to him that the cocaine was taken over a period of time, perhaps in only two administrations, with the last being within four hours of the victim's death. As noted above, James was in Shelton's room during such time period.

Dr. Kamm opined that the victim's body had not been able to break down all of the morphine at the time of his death, indicating it was taken "fairly recently" before his death. The Alprazolam was not found in a lethal level, but morphine was present in lethal amounts.

Dr. Kamm explained morphine is most commonly injected or inhaled. Because the documents provided to him indicated that the victim's body showed no injection marks anywhere, he believed the victim most likely inhaled it. The autopsy report indicated no pills or capsules were found in the victim's stomach.

He opined the victim could have vomited any pills or capsules he may have consumed, decreasing the gastric contents found during the autopsy. Dr. Kamm's procedure in that event would be to examine any vomitus found near a victim. In this case, no testing was done on the brown substance found on the carpet, underwear, afghan, pillow case, belt, wash cloth, t-shirt, shoes, comforter, or socks in Defendant's apartment. Further, Dr. Kamm testified the toxicology reports showed "there was not one massive dose" of cocaine. Rather, the victim "had experienced it at least on multiple occasions, maybe only two." Further, he believed "the ingestion of this overdose was less than four hours prior to death" but he could not exclude 24 hours as "an outside time" for the earlier ingestion(s), based on the presence of the metabolites. He stated that "inhalation is a voluntary event," and in his opinion "it's very difficult to get [people] to inhale something they don't want to." Nevertheless, it was his opinion that James had ingested the cocaine by inhalation as the reports did not identify any injection marks.

The State admitted two photographs previously deemed inadmissible, on the showing made in that writ application, by this court over Shelton's objection in an effort to show similarity between this purported crime and the situations shown in the photographs. *State v. Shelton*, an unpublished writ decision bearing docket number 09-819 (La.App. 3 Cir. 10/22/09). Dr. Kamm believed "from the limited amount of information [he saw]," the unidentified individual portrayed in Exhibit S-34 appeared to be unconscious. He admitted the individual could be either intoxicated or unconscious, or, the individual could simply be "laying there," or, the photograph could be posed.

Further, with regard to James wearing no pants when authorities arrived at the apartment, Dr. Kamm testified he "couldn't make any real accusation or any real

thing out of it as to whether it was done by someone else or by the individual or what was going on."

Dr. Frank Peretti (Peretti), associate medical examiner/forensic pathologist for the State of Arkansas, performed the autopsy on James on October 31, 2005. He completed his autopsy report on December 15, 2005. He was qualified as an expert at trial in the field of forensic pathology. Dr. Peretti concluded that in his opinion no oral or anal sex occurred with this victim because no sperm was found on the oral cavity, no saliva was found on the penile swab, and no sperm was present on the anal swab.

Regarding the presence of PSA on the victim's rectal swab, Dr. Peretti offered his opinion by an explanation. Because PSA is found in the semen and male urine, but contains no DNA, the donor cannot be identified. He opined one logical explanation which might explain the presence of PSA:

> When males die, there is [sic] little muscles in the seminal vesicles around the prostate, and because we go through rigor mortis quite fast, 99% of men . . . after males die they ejaculate. And a lot of times . . . we see it every day, it sort of dries and it runs down. So, a lot of it, what we see is . . . the deceased['s] PSA.

Dr. Peretti also believed the slippery, glistening substance seen by Randy Williams and James Parker was dried ejaculate of the victim. He specifically "looked for foreign material, in case there was a lubricant." Neither Dr. Peretti nor the crime lab found anything. If a lubricant had been present, he believed he "would've seen it on the slide."

Additionally, Dr. Peretti found the victim's anus to be atraumatic. Dr. Charles Curtis, the Natchitoches Parish coroner, told Dr. Peretti "they were looking for" evidence of forcible sodomy; Dr. Peretti "spent an extra details and to looking for [sic], and it's not there. He was not sodomized, there was no trauma, whatsoever, and there was no sperm." Dr. Peretti believed anyone who thought the

14

anus was dilated or "somewhat opened in comparison with its normal state" was wrong. He expressed his opinion that if the victim never experienced sodomy before, any insertion of a penis into his anus would have caused a tear, regardless of whether he was in a drugged state. Although Dr. Peretti testified in his opinion no rape occurred, he could not tell from his examination whether an attempted rape or attempted sexual battery took place.

Because other substances associated with morphine were not present, Dr. Peretti felt the victim took pure morphine at the time of his death. The presence and amounts of cocaine in the blood, urine, and vitreous fluid indicated to him that the victim was using the drug at least twenty four hours prior to his death. Dr. Peretti explained the chemicals travel from the blood to the vitreous fluid and then are eliminated through the urine. He believed the victim's first cocaine use occurred at least twenty four hours prior to his death because a cocaine metabolite, cocaethylene, was present in all three fluids. The toxicology report showed the blood was negative for alcohol but positive for benzodiazepines, cocaine and its metabolites, and morphine. The vitreous fluid contained cocaine and its metabolites, and the urine was positive for cocaine, its metabolites, and morphine.

The State placed great weight in its closing argument on the fact that the victim was found nude below the waist and his pants were never recovered. The rest of the victim's clothes were in the apartment next to Shelton's bed including James' underwear, socks, shoes, and belt. No one asserts that James arrived in Shelton's apartment without pants. Further, the State's expert testified that it is not likely the victim had the coordination to remove his shoes and pants in his severely drugged state. The State maintained Shelton removed the victim's pants. The State further maintained that Shelton removed the pants from the apartment because they contained incriminating evidence. The record does not indicate that any

15

search was ever made for the pants. Nevertheless, consistent with this assertion, the officers who responded to the 911 call testified that it appeared to them an effort was made to clean up the victim's vomit and to hide what could not be cleaned up with a blanket thrown over the vomit. They further testified that visible drag marks on the carpet indicated the victim was dragged from the area near Shelton's bed to the area in the doorway where he was lying when the officers arrived. Additionally, one officer and the assistant coroner testified that the victim's posterior was very clean, which is unusual under the circumstances, that they observed a shiny, viscous substance on the victim's rectum, and that the rectum appeared open at the time of their exam immediately after the victim was brought to the hospital. Evidence showed that James was in Shelton's apartment for many hours prior to his death and showed that he had been drinking alcohol several hours prior to meeting Shelton.

It was for the jury to judge the credibility of the witnesses, including expert testimony, in reaching its conclusions. Based on the evidence presented at trial the jury could reasonably conclude that Shelton's hypothesis of innocence was not reasonable. Given the evidence of Shelton's prior criminal conviction for sexually assaulting a young male, his photographing of young males nude from the waist down while engaging in sexual contact with them, the fact that the victim's family and friends testified James was not a drug user, had not used drugs on the day in question, and did not engage in homosexual behavior, the observations of the officers immediately after the incident which included attempts to hide and/or destroy evidence, finding this young male victim nude from the waist down, severely impaired on multiple drugs and alcohol, with what appeared to a police officer and the assistant coroner who examined the victim first at the hospital to be

16

a shiny lubricant on his rectum, we cannot say the jury acted unreasonable in reaching its verdict.

Likewise, we reject Shelton's assertions that the photographs and other crimes evidence should not have been introduced. This evidence was very relevant as to motive, intent, preparation, plan, system and absence of mistake or accident. *See* La.Code Evid. art. 404(B) and *State v. Archield*, 09-1116 (La.App. 3 Cir. 4/7/10), 34 So.3d 434. We will not disturb the trial court's ruling as to the admissibility of such evidence in the absence of a clear showing of abuse of discretion. *State v. Scales*, 93-2003 (La. 5/22/95), 655 So.2d 1326. We find no abuse of the trial court's discretion as the record reveals the evidence was very probative as to Shelton's actions regarding James. The facts surrounding James' death include many similarities with Shelton's other conviction for sexually assaulting a young male, and his photographing of other young males nude from the waist down, along with his victims, including James, being in drug induced states. The evidence is relevant and highly probative as to Shelton's motive, intent, and manner of carrying out his predatory sexual activities.

Shelton attempts to make much of Dr. Paretti's testimony in that he opined no sexual assault occurred. The jury was free to weigh all of the evidence, including accepting or rejecting Dr. Peritti's testimony. *State v. Willis,* 05-218 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, *writ denied*, 06-186 (La. 6/23/06), 930 So.2d 973. The autopsy report of Dr. Frank Peretti indicated the "investigation of the circumstances of death revealed that the decedent was at an acquaintance's home when he was found slumped over his computer." *None of the testimony at trial supported this statement in Peretti's report.* Even Shelton's statement, admitted at trial, said:

17

I fell asleep and awoke at approx [sic] 9:00 am where I found him (Justin) snoring on the floor near my bedroom desk. At about 10-11:00 am (not sure on the time) I tried to wake him, he was still snoring. As I shook him he began to vomit. I couldn't wake him & found no pulse.

The investigating officers testified they found James lying on the floor in the doorway of Shelton's apartment and also found drag marks in the room and vomit hidden under a blanket near the bed indicating James' body had been moved from Shelton's bed to the door. There was also what appeared to be vomit on the pillow case, comforter, and afghan in Shelton's bedroom. We note also that even Dr. Paretti admitted he could not say whether James was a victim of an attempted rape or sexual assault, and he could not rule out that possibility. The record reveals substantial evidence from which the jury could reasonably conclude that James was the victim of at least an attempted rape or sexual assault and that his death occurred during the attempted perpetration of such crime(s) while he was rendered incapable of resisting due to a drug-induced state instituted by Shelton. There is sufficient evidence to support the verdict of manslaughter.

**CONVICTION AFFIRMED**.