# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-798


**STATE OF LOUISIANA**

**VERSUS**

**TEDDY AGUILLARD**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 15-2347
HONORABLE A. GERARD CASWELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## PHYLLIS M. KEATY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Phyllis M. Keaty, John E. Conery, and Van H. Kyzar, Judges.


**AFFIRMED.**

**Earl B. Taylor**
**District Attorney**
**Jennifer M. Ardoin**
**Assistant District Attorney**
**Post Office Drawer 1968**
**Opelousas, Louisiana 70571**
**(337) 948-0551**
**Counsel for Appellee:**
  **State of Louisiana**

**Katherine G. Guillot**
**Hawkins Oetjens, LLC**
**913 S. College Road, Suite 260**
**Lafayette, Louisiana 70503**
**(337) 210-8818**
**Counsel for Defendant/Appellant:**
  **Teddy Aguillard**

**KEATY, Judge.**

Defendant, Teddy Aguillard, appeals the trial court's convictions and sentences. For the following reasons, we affirm the trial court.

**FACTS & PROCEDURAL BACKGROUND**

On May 26, 2015, Defendant, Teddy Aguillard, owned a driving school in Eunice and was teaching driving lessons when he made lewd comments to two of his juvenile students, S.B. and A.A.[1] On October 26, 2015, Defendant was charged with two counts of indecent behavior with juveniles, violations of La.R.S. 14:81(A)(2).[2] On February 17, 2017, a unanimous jury found him guilty as charged on both counts. On March 9, 2017, Defendant was sentenced to five years at hard labor on each count, and the sentences were ordered to run concurrently with one another. The trial court informed Defendant that he would be required to register as a sex offender for fifteen years upon his release from incarceration. Following a hearing on April 13, 2017, the trial court denied Defendant's motion to reconsider sentence. Defendant appealed.

On appeal, Defendant asserts the following assignments of error:

1.  The evidence introduced at the trial of this case, when viewed under the standard enunciated in *Jackson v. Virginia*, was insufficient to prove beyond a reasonable doubt that Defendant committed the crimes of Indecent Behavior with a Juvenile.

2.  Defendant, Teddy Aguillard, was deprived his constitutional right to a fair trial before an unbiased jury by the introduction of improper other acts evidence by the State in violation of U.S. Constitution Amendments V, VI, and XIV; Louisiana Constitution Article I Sections 2 and 16; and LSA-C.E. Art. 404(B).

3.  The Trial Court erred in imposing a sentence of five (5) years at hard labor with the Department of Corrections, as such sentence

---

[1] In accordance with La.R.S. 46:1844(W), the victims' initials are used in order to protect their identity.

[2] According to the minutes, the Bill of Information was amended on December 8, 2016, to reflect that the juveniles were under the age of seventeen.

is excessive and in violation of Article I, Section 20 of the Louisiana Constitution and the Eighth Amendment to the United States Constitution.

## DISCUSSION

### I. Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent. In that regard, the crime of indecent behavior with juveniles requires the trial court to order the seizure and impoundment of the personal property used in the commission of the offense and, after conviction, to order the property sold at public sale or public auction by the district attorney. La.R.S. 14:81(H)(3). In this case, the trial court's failure to order impoundment and seizure of Defendant's personal property used in the commission of this offense renders the sentence illegally lenient. "However, this court will not consider an illegally lenient sentence unless it is a raised error." *State v. Celestine*, 11-1403, p. 2 (La.App. 3 Cir. 5/30/12), 91 So.3d 573, 575.

### II. First Assignment of Error

In his first assignment of error, Defendant contends that the evidence introduced at trial, when viewed under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), was insufficient to prove beyond a reasonable doubt that he committed the crime of indecent behavior with juveniles. Defendant alleges the State failed to prove that he possessed the specific intent to sexually arouse himself or the victims when he made the comments in question. Defendant asserts that his inappropriate comments were not lewd or lascivious.

In Louisiana, the standard of review utilized when reviewing a sufficiency of the evidence claim is discussed in *State v. Williams*, 16-140, pp. 9-10 (La.App. 3 Cir. 9/28/16), 201 So.3d 379, 388 (quoting *State v. Miller*, 98-1873, p. 5 (La.App.

2

3 Cir. 10/13/99), 746 So.2d 118, 120, *writ denied*, 99-3259 (La. 5/5/00), 761 So.2d 541), as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). The role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

In this case, Defendant was charged with and found guilty of two counts of indecent behavior with juveniles, violations of La.R.S. 14:81(A)(2), which provides:

> A.  Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
>
> . . . .
>
> (2)  The transmission, delivery or utterance of any textual, visual, written, or oral communication depicting lewd or lascivious conduct, text, words, or images to any person reasonably believed to be under the age of seventeen and reasonably believed to be at least two years younger than the offender. It shall not be a defense that the person who actually receives the transmission is not under the age of seventeen.

The first witness to testify at trial was S.B., who was born on December 5, 1999 and was fifteen years old during the incident. S.B.'s testimony revealed that in May 2015, she attended Gator Driving School, which was owned and operated by Defendant. S.B. advised that during her instructional training, which took place in a classroom, Defendant told the students "not to tell our parents [and] what happens in his class stays in his class." She testified that Defendant would also "make jokes about a letter 'D,' like you don't get it, like you don't the [sic] letter

3

'D,' what it stands for, if I may say 'dick.'" S.B. testified that her friend, A.A., attended class with her.

As for the driving portion, S.B. advised that she and A.A. drove together with Defendant. S.B.'s description of the first day of driving revealed the following:

> Mr. Teddy had made a little joke that asked if we wanted to see a big white cock and he started to pull down his pants which I was driving and we both had screamed, "No," and then he was like, "Look outside your window," and we had laughed but it wasn't a funny laugh. It was that we were relieved that it [sic] wasn't actually showing what he was going to show us.

At the time, S.B. believed Defendant was going to expose himself because he "went to touch his pants to pull down his pants leg" "[b]y his crotch area." She advised, however, that Defendant actually pointed to a rooster that "was in somebody's front yard." S.B. said she felt uncomfortable during the first day of driving.

S.B. testified that on the second day of driving, Defendant looked at pictures on both her and A.A.'s cellular phones. According to her testimony, Defendant found a picture of S.B. in a bathing suit and asked who was the girl in the picture. S.B. explained that when she advised that she was the girl in the picture, Defendant replied: "You're lying because this girl has tits and you don't[.]" S.B. indicated that Defendant also talked about her breasts on another occasion, which she described as follows: "When I was driving he told me that we should stop . . . at the Walmart Distribution Center to get me a training bra because I have no tits." S.B. claimed that Defendant said A.A. had big "ones and I didn't." S.B. revealed that Defendant's comments about her breasts made her feel "[a]shamed, embarrassed," and "really uncomfortable."

4

S.B. further testified that on one occasion when she was in the backseat and A.A. was driving, Defendant was sitting in the front passenger seat and pulled out his cellular phone. She indicated that from her location in the backseat she was able to see Defendant's phone, which contained "pictures of girls' body parts and area parts that were fully - - no clothes, naked[.]" Defendant did not try to hide his phone from her, according to S.B.'s testimony. When S.B. asked Defendant why he was showing them the contents of his phone, Defendant responded, "because [my] wife doesn't give out, only on Jesus' day which is Sunday." S.B. advised that Defendant never touched her inappropriately, although he pulled her hair when she "was to get out the car and . . . pulled down [her] hair when [she] had got out the car."

On cross-examination, S.B. denied that she requested to drive with Defendant. Defense counsel also elicited testimony from S.B. indicating that she did not specifically mention crotch area in her initial police report to Detective Nicholas Cooley. S.B. clarified, however, that although she did not write it in her report, she did tell Detective Cooley that Defendant put his hand by his crotch. S.B. testified that her report states that Defendant "went to pull . . . his pants leg down." She revealed that she laughed when Defendant made the "white cock" joke, but it was a laugh of relief "that it wasn't what he was showing us, trying to show us."

On further cross-examination, S.B. discussed the second day of driving and revealed that Defendant used the word "tits," not "boobs." According to S.B, Defendant was making fun of her which made her uncomfortable. S.B. agreed that she punched Defendant in the arm three times, and she knew he was not joking because "it wasn't funny." Defense counsel showed S.B. her police report wherein she noted that Defendant was "clowning my boobs." S.B. advised that "clowning"

5

meant talking about them. She agreed that she referred to "boobs" in the police report. S.B. advised that her parents asked her about what happened when she returned home after the second day. S.B.'s testimony on cross-examination with respect to viewing pornography on Defendant's phone and Defendant's explanation for the pornography was identical to her testimony on direct examination. When asked if she was "turned on" by anything Defendant said, S.B. replied, "Not at all."

On redirect examination, S.B. denied talking about sexual things with her friend, Logan Daigle. S.B. explained that she did not use the word "tits" in her police report because she feels more comfortable using the word "boobs." The following colloquy also took place between the prosecutor and S.B. with respect to Defendant's crotch area:

> Q.    And [Detective] Cooley he didn't talk a lot about - - about clarify the crotch. I use the word "crotch." Was it near his foot area where he touched himself after saying, "Do you want to see a big white cock?" Did he touch himself some kind of way?
>
> A.    In the upper area, yes, ma'am.
>
> Q.    Was it in the lower pant leg like down here?
>
> A.    No, ma'am.
>
> Q.    And that's what I'm trying to be clear. Can you stand up and show the jury the area he touched himself in?
>
> A.    Right here.
>
>      THE COURT: Let the record reflect that the witness used her right hand and touched the upper right thigh where the thigh would meet the groin area.

The next witness to testify was Erica Landry, S.B.'s stepmother. Ms. Landry described learning of the incident while talking to A.A.'s mother, Kelly Ardoin,[3] and the two victims. Ms. Landry explained:

> [S.B.] and [A.A.] drove that morning and they went to school because they had volleyball tryouts that day. . . . [W]hen I came home from work, Kelly came with both of the girls and . . . she said, "Erica, let me tell you about what Mr. Teddy said today," and she proceeded to tell me about the big white cock joke, and she said he grabbed himself. I said, "What do you mean," and she said he grabbed his pants and she showed me where he grabbed. I said, "Did he pull his pants down?" She said, "No, he did not pull them down but as soon as he grabbed them, he pointed to a rooster," and we were like, "Oh, okay, you know." Fifteen year old girl, get his stuff, doesn't know how to handle it, really. She didn't know how to handle that situation.

Ms. Landry testified that she was "stunned because that's not a way to joke." She further explained:

> I kind of had to absorb, had to think about it, because . . . your first reaction is do I allow my child to go back or ask her if anything else has happened. . . . So I said, "Are you okay with going back? Did he touch you?" "No he didn't pull his pants down. It was just - - it was a dirty joke." I said, "Okay." She went the next day and, uh, Kelly and I spoke throughout the day. We agreed that we needed to talk to the girls that evening and make sure that nothing else was happening. Uh, that second evening is when she spilled the beans after I told her she wasn't going back because we were uncomfortable.

Ms. Landry indicated that she felt S.B. was not safe and did not deserve to be spoken to in such a dirty way.

On cross-examination, Ms. Landry revealed that she and her husband allowed S.B. to return to driving lessons the second day because they "were indecisive" as to whether Defendant made a dirty joke or whether he was "this type of person." She noted that S.B. did not mention any other comments made by Defendant, so she and her husband allowed S.B. to return since she would have a driving partner and would not be alone with Defendant. When Ms. Landry talked

---

[3] We will refer to Kelly Ardoin as "Kelly" to distinguish her from Defendant's mother, Connie Ardoin.

to S.B. after the second day of driving, she and her husband decided that S.B. would not return. Ms. Landry testified that she went to the police to report that her stepdaughter had been exposed to inappropriate comments and remarks about her body.

On redirect examination, Ms. Landry advised that Defendant contacted her by text message after she went to the police and stated "that he was going to lose his business and this would ruin his life." Defendant also offered to refund their money, according to Ms. Landry's testimony.

The second victim, A.A., testified that she was born on January 24, 2000. She remembered Defendant telling the class not to tell their parents about anything that was said. A.A. recalled that Defendant wrote an A, B, and C on the board when someone asked, "What about the 'D[,]'" and Defendant answered, "That's what you don't get," implying sexual innuendo. A.A. agreed that Defendant made the "white cock" comment during the driving portion of the course, explaining:

> Uh, he said, "Do you want to see a big white cock," and he touched like his part of his pants and me and [S.B.] both turned our heads and . . . we said, "No," and he said, "Look, there's a big rooster on the side of the car."

A.A. noted that Defendant made the comment while motioning towards his upper pants or upper thigh area. When asked to show where he rubbed, A.A. responded and motioned: "Uh, like right around here he rubbed." The trial court noted: "Let the record reflect that the witness has appeared to indicate by rubbing the upper part of her right thigh right below where it joins the groin area." A.A. did not remember if Defendant was laughing when he made the comment, although she did not think it was funny and it made her uncomfortable. According to A.A.'s testimony, she told her mother about the "white cock" comment when she picked A.A. up at the end of the day.

A.A. testified that she returned to driving lessons the following day when Defendant took her and S.B.'s phones and made the following comment about S.B.'s picture: "That [S.B.] had bigger tits and a bigger ass, like her picture wasn't her. He said like her picture had bigger tits and a bigger ass than [S.B.] had." A.A. acknowledged that she used the word "boobs," previously although she was adamant that Defendant used the words "tits" and "ass." A.A. recalled Defendant stating that his wife did not "put out." Regarding other students, A.A. remembered Defendant commenting about his desire to have sex with one of his students when she got older. When asked if there was an incident where she took a curve too fast, A.A. replied, "No, ma'am. That was [S.B.]." According to A.A., Defendant yelled and cursed at S.B. when she took the curve too fast.

A.A. testified that on the second day while S.B. was driving, A.A. witnessed Defendant looking at pornography on his phone. A.A. did not comment about the pornography and was unsure how long it remained on his phone. She described the pornography as people without clothes on. A.A. explained that Defendant was sitting on the passenger side, leaning back, and holding out his phone. She did not believe Defendant was trying to hide it from her. A.A. testified that both the pornography and Defendant's comments made her uncomfortable. She testified that she never requested to drive with Defendant.

On cross-examination, A.A. acknowledged that Defendant did not show her pornography; rather, she looked at it on his phone from her position in the rear seat. A.A. admitted that her trial testimony was the first time she reported that Defendant made inappropriate comments during the classroom instruction portion of the driving course. She admitted that she forgot to mention in her police report both the pornography incident, which occurred during the driving portion, and Defendant's statements made during the classroom instruction part of the course.

9

A.A. further advised that in her police report, she stated that Defendant was rubbing "his pants [sic] leg" rather than "crotch area." She witnessed Defendant rubbing his pants leg from the back seat, according to her testimony. A.A. noted that her location allowed her to see Defendant's hand move and where his hand touched. A.A., who was unable to remember whether they laughed after Defendant made the "white cock" comment, explained: "I don't remember laughing[,] and if I did laugh[,] it was a nervous laugh. I was glad it was over with." A.A. testified that after Defendant yelled and cursed at S.B., S.B. advised that she no longer wanted to drive with him. A.A. did not remember S.B. expressing her desire not to ride with Defendant after he made the "big white cock" comment or after he commented on S.B.'s breasts.

On re-direct examination, A.A. advised that while writing her police report, she could not recall being asked detailed questions. A.A. noted that she was not trying to mischaracterize what happened during the incident. She advised that she did not want to return to the second day of driving because Defendant's previous comments about their "bodies and everything" made her uncomfortable.

A.A.'s mother, Kelly, was the next witness to testify. According to her testimony, Kelly picked up A.A. and S.B. after the first day of driving. She advised that on the way home, S.B. told her about Defendant's comments and gestures which concerned her, causing her to speak with S.B.'s stepmother, Ms. Landry. When asked if she told Ms. Landry what S.B. said, Kelly replied:

> I did. . . . I told her, you know - - it kind of felt like, you know, when these kids tell me about the big white cock, it's like huh, that don't make sense but it's like maybe it's a one time thing. We're going to - - I slept on it, you know, and I woke up the next morning and I said, "Huh." I let her go because it might have been a one time thing.

According to Kelly's testimony, she allowed A.A. to return to driving lessons the following day after which she learned of a "similar situation" that

10

concerned her. Kelly advised that when A.A. returned home after the second day of driving, she "questioned [A.A.] and then [A.A.] started telling [Kelly] things that were done that day besides the day before." Kelly testified that at that point, she informed A.A. that she was not going back to Defendant's driving school. Kelly stated that she accompanied A.A. to the police station to give a statement.

On cross-examination, Kelly acknowledged that A.A. was not emotionally distraught after the first day. She testified that while the girls were driving the second day, Kelly's father told her about another story involving Defendant. Kelly further testified that when she saw A.A. after the second day, A.A. told her about the naked pictures on Defendant's phone and his comparison of A.A.'s and S.B.'s body parts.

The next witness to testify was Detective Cooley, who was a juvenile detective with the Eunice Police Department in 2015. His testimony reveals that after getting statements from A.A. and S.B., he asked Defendant to go to the police station for an interview, which he did on May 30, 2015. He learned Defendant's date of birth was October 7, 1969, making him forty-five years old at the time of the interview. According to Detective Cooley, Defendant admitted to making the comments regarding S.B.'s "tits" and a "big white cock," but indicated that his comments were made in a joking manner. Detective Cooley noted that when Defendant was arrested, he declined to give a statement. Detective Cooley learned that Defendant had been previously investigated in connection with inappropriately interacting with two other females. On cross-examination, Detective Cooley advised that Defendant agreed that he used the word "tits" during his conversations with S.B. and A.A.

The next witness to testify was Marina Clark. Ms. Clark was twenty years old at the time of the trial and was born on December 30, 1996. According to her

testimony, she attended Defendant's driving school in February 2015 when she was eighteen years old. Ms. Clark revealed that the first time she drove with Defendant, his mother was in the back-passenger seat. Ms. Clark stated that once they dropped his mother off at a car dealership, Defendant stated: "I couldn't answer this with my mom in here but earlier when you asked if you're going straight, did you mean that's your body?" Ms. Clark understood Defendant's question as asking whether she was bi-sexual, wherein she responded: "No, I have a boyfriend."

Ms. Clark recalled discussing Mardi Gras with Defendant when he advised that he was separated from his wife. Ms. Clark told Defendant that she was sorry about the separation, and Defendant's response was: "Well, my wife's at home[,] and I'm here with you so get it we're separated, so if you wanted to molest me I wouldn't tell my wife." Ms. Clark stated that Defendant was being serious when he made that offer, which she declined. Ms. Clark revealed that Defendant continued talking about Mardi Gras, saying that "[h]e likes to go to Bourbon Street and get drunk and show his dick piercings for beads." Ms. Clark revealed that Defendant said that "he'd watch girls on the balcony play with each other and that he'd go to . . . sex shows and watch girls with whips and chains and the girls would get whipped on their nipples." Ms. Clark noted that Defendant said he likes to go to Mud Fest where he runs around naked and "where a guy that hangs out in the back . . . masturbates all night."

Ms. Clark testified that she brought her friend, Bailey Newman, to the driving lesson the following day. Ms. Clark advised that as she was driving, Defendant described his piercings and took both of their phones. Ms. Clark noted that Defendant told them he had taken a previous student's phone and found a naked picture she had sent her boyfriend. According to Ms. Clark's testimony,

12

Defendant said he was looking for a similar picture in Ms. Clark's phone. Ms. Clark advised that she and Ms. Newman were talking about a friend of theirs when Defendant interjected and said that he remembered that same girl from one of his past classes. Defendant said he would not have sex with their friend because she was fat, according to Ms. Clark. Ms. Clark revealed that Defendant said he prefers girls more the size of her and Ms. Newman. Ms. Clark then described a conversation the three of them had over lunch at Raising Cane's wherein she stated that she was not eating too many chicken fingers because she had eaten "two fingers before" driving lessons. Ms. Clark revealed that in response, Defendant stated: "Oh, since your boyfriend's at work, you had to give yourself two fingers." She advised that Defendant was suggesting that she was "playing with" herself.

Ms. Clark revealed that after leaving Raising Cane's, she drove Defendant and Ms. Newman to a bead store. According to Ms. Clark, inside the store, Defendant asked the girls several times if they would show him their "boobs" for beads. She advised that they said "no." Ms. Clark testified that Defendant asked her to help him make Ms. Newman show him her "boobs." Ms. Clark noted the following about Defendant: "He was a creep[,] and I'm probably not the only one he's talked to like this[,] and I don't see why people let him talk like that, why he hasn't gotten in trouble for it before." Ms. Clark testified that at the end of the lesson, Defendant apologized to her by stating, "Your friend's mad. I know that I take things too far," and he said, "I'm sorry." A couple of days later, Ms. Clark filed a police report. On cross-examination, Ms. Clark remembered that during her driving lesson, she picked up three students from a high school. According to Ms. Clark, Defendant did not continue with the same commentary while these students were in the car.

The next witness to testify was Ms. Newman, who was born on March 7, 1997. She indicated that she was seventeen years old in February 2015 when she rode with Ms. Clark and Defendant. Ms. Newman recalled that she previously took driving lessons at Defendant's school but did not experience any of the things that Ms. Clark experienced. According to Ms. Newman, she agreed to ride with Ms. Clark during Ms. Clark's second day of the driving lessons. Ms. Newman advised that during the ride, Defendant talked "about dick and vagina piercings." Ms. Newman testified that Defendant also said, "that he would fuck me and her but he wouldn't fuck the other girl that was in the class that was with me because she was her [sic] fat." According to Ms. Newman, Defendant began talking about these things without any prompting.

Ms. Newman testified that Defendant took Ms. Clark's phone and began looking through her photographs to see if he could find a nude picture. According to Ms. Newman, he then started playing with Snapchat and told them that he had received nude photos through Snapchat. As for their stop at Raising Cane's, Ms. Newman testified that, "as we were passing by the men's bathroom, [Defendant] tugged on my shirt towards the men's bathroom indicated [sic] that he wanted me to go with him[,]" and that Defendant "tugged on it hard enough to where I kind of stumbled." She agreed that Defendant "made a sexual joke out of [chicken fingers] saying that Ms. Clark fingered herself[,] and he made a similar joke to me after." Ms. Newman recalled Defendant asking her to show him her breasts for beads. Defendant used the terms "boobs" and "titties," according to her testimony. Ms. Newman testified that a few months later, Defendant left Ms. Clark a voicemail asking her if they could "settle this without the cops." She advised that Defendant also called another one of their friends and said he would refund the class money if she and Ms. Clark would drop the charges.

On cross-examination, Ms. Newman explained that when she and Defendant were walking to the bathroom at Raising Cane's, Defendant grabbed the shoulder of her shirt with his hand. Ms. Newman advised that she understood Defendant's action to mean that he wanted her to go into the bathroom with him "because when I looked at him he grinned at me." Ms. Newman did not take Defendant's gesture as him jokingly trying to keep her from going to the restroom. Defense counsel then asked Ms. Newman to point out in a statement that she made at home where it says that Defendant "would fuck you and your friend but not the other one because she was too fat." In response, Ms. Newman stated: "It's not in this statement but it's in the recorded statement." The State then rested its case.

The first witness to testify for the defense was Defendant. According to his testimony, in February 2015, Defendant's driving school had been open for five years. Defendant stated that he had a policy not to drive alone with a female juvenile although that policy did not extend to adults. When asked if he heard the adult conversations of which Ms. Clark testified, Defendant replied, "[y]es." According to Defendant, Ms. Clark usually participated in the conversation and responded in kind. Defendant denied telling Ms. Newman and Ms. Clark that he would have sex with them but not their friend because she was too fat. Defendant remembered talking about Mardi Gras with Ms. Newman and Ms. Clark. He denied showing Ms. Clark pictures of naked people on his phone.

As for the Raising Cane's incident, Defendant claimed they stopped there because Ms. Newman kept complaining that she needed to go to the restroom. According to his testimony, they kept forgetting to stop, and it became an ongoing joke. Defendant stated that he did not forcibly try to pull her into the bathroom. Rather, the following occurred according to his testimony:

Well, since we had been laughing and joking about it for a while and she needed the bathroom so bad . . . that whenever . . . we got in the hallway[,] she went to turn, I grabbed her cuff sleeve right here and I said, "No, you can't go to the bathroom," you know, just - - 'cause you do that all the time with kids or . . . people that need the bathroom real bad, you tell them . . . "No, you can't go," and she looked at me. I smiled and let her go, that simple, and I went in my restroom, she went in hers. End of story.

When asked whether he intended to have any kind of lewd or lascivious conduct between any of them, he responded, "No." Defendant explained that from what "[Ms. Newman] said when she got in the car, she's not the type of person you want to have anything intimate with because she would tell . . . stories about her intimacy" and if he "consider[ed] even doing something like that she would tell people and it would get back" to his wife and affect his "reputation for the school." Defendant denied talking to the girls about having sex with former students.

As for the victims in the present case, S.B. and A.A., Defendant was questioned whether profanity was used during the classroom instruction portion of the course. Defendant explained that he tried to keep profanity to a minimum, and he spoke at the same level that the students would hear on television. Defendant admitted they talked about "boobs" but denied ever saying "the other word." When asked about an incident where he left out the "D" during class, Defendant stated he did not know what S.B. and A.A. were talking about. Defendant testified that he originally scheduled S.B. and A.A. to drive with another instructor, but they specifically requested to drive with him through their friend, Mr. Daigle. Defendant explained that he tried to keep the atmosphere in the car lighthearted because students are usually nervous. As for the "big white cock" comment, Defendant explained:

Yes, sir. When I looked up and I saw it, we was in that area, I thought it would be funny, you know, and "Hey, look, a big white cock," you know. "If you want to see a big white cock, look right there," 'cause

that's what it is, you know. That's the proper English word for it. That's what they call it in the Bible. I grew up calling it a cock and a hen so that's what it is.

Defendant denied grabbing his crotch area and explained:

I might have rubbed my . . . leg but that's just a nervous habit because . . . my palms stay cold so I try to warm them but, no. . . . I'm too fat to do that so no. All I did was say, "Hey, you want to see a big white cock," and I pointed.

Defendant testified that S.B. and A.A. laughed because "they thought it was funny."

When asked if he ever showed S.B. and A.A. pornographic images, Defendant replied:

I never showed anybody anything. The only thing I can understand maybe is I looked at my phone. If I went to my Twitter I do have what's called Shower Thoughts on it. It's some funny quotes and - - but it's for me to see. One's sitting way back there. This one's driving. If I look down at my phone, they might - - on my Twitter account, they might have had a naked person on it but I never showed them my phone. I never said, "Hey, look at this," and my phone is here against my big belly where I can read it and, you know, this one's driving, my phone's like this. I even have a habit of tilting it slightly to the right so the driver can't see it, you know, and then besides that, I also have a lock on my phone because there's been a couple of occasions where the kids take my phone and try to go through my phone so I - - I have a lock on that so they can't get to it.

However, Defendant admitted to taking and looking through their phones, "[f]or a number of reasons." He explained:

One, kids nowadays are addicted to their cell phones and one of the biggest problems is them texting and driving. I take their phones while they drive to teach them that they can live without their phones. They don't need to have their phones in their hands 24-7. They don't need to be stressed out about their phone . . . just to show them hey, you can drive without knowing what's going on on your phone. That's the first reason I do it. The second reason sometimes I look at their phone is if the conversation is starting to run out. They put everything on social media anyway but I don't . . . go to Facebook. I have one but I don't go to it so instead of going to their Facebook and seeing their lives, I can go through their phone and find something funny to pick on them about, you know, or start another conversation, you know, find out, "Well, you got horses? Well, I got some horses," you know, just things like that to talk about.

17

Defendant denied telling A.A. and S.B. that he was looking at their phones to find naked pictures. Defendant testified that both the "white cock" incident and the looking at the phone incident happened on the first day of driving instruction. As to the phone incident, he further explained:

> Then when I was looking through her phone, and by the way, she had a lock on her phone. . . . She actually gave it to me to get in the phone. Then I said - - 'cause I didn't recognize who it was on the picture. I . . . wear glasses most of the time and I didn't have them on so I said, "Who's this," and [S.B.] said, "Well, that's me." I said, "That ain't you. That girl got boobs," and she immediately . . . tried to turn it onto [A.A.]. She's like, "Why don't you pick on [A.A.]. She's got boobs." I'm like, "Exactly, she's got boobs and you don't. Don't be hating," and from there she - - it became . . . a running joke[.]

Defendant denied using the word "tits" and explained that "boobs" sounded funnier, just like "booty" sounded funnier than "ass." According to Defendant, S.B. and A.A. were laughing and conversing the whole time. He further explained:

> The second day, I didn't even bring it up first. [S.B.] brought it up first and made a joke about it and it's like, "Okay, you know, hey, you want to joke about it. I can joke about it," and she didn't say that I was upsetting her . . . She's like, "Don't be saying I ain't got no boobs," and then she'd hit me and laugh, you know. Yeah, she punched me on the arm like - - like she put in her statement three times, you know. I'd make a joke. "Don't say I ain't got no boobs," and she'd punch me and laugh the whole time, you know, and my thing is, you'd have to know me, too, as soon as she tried to change it from her and she'd try to put it on [A.A] - - I mean, I already didn't like the little girls because of their attitude but when she tried to turn it on her supposedly best friend, then I'm like, "Hey, if this is going to piss you off, you know, oh well."

Defendant said he had no intent of any lewd or lascivious conduct towards S.B. and A.A. Defendant further testified:

> I was making her upset. I was pissing her off because I told her she had no boobs. That's not how you turn somebody on by pissing them off. It never occurred to me. I was dumbfounded whenever [Detective] Cooley came up with that charge.

Defendant stated that he voluntarily gave a statement to Detective Cooley. He testified that he "told a joke about a rooster and . . . pissed a little girl off telling her

18

she ain't got no boobs. That's not against the law." Defendant stated that he never used the word "tits" when talking with Detective Cooley and that he always used the word "boobs." When asked why he called the families if he felt he did nothing wrong, Defendant responded that, "sometimes people take things the wrong way." He noted that, "[i]t's better to call and apologize and get it over with without involving . . . other people because that's . . . my job and my livelihood, you know, so you want to protect your reputation." Finally, when asked if he admitted some of his comments were inappropriate, Defendant responded: "With the adults, maybe. The kids, with the rooster, it was a dumb joke. Yeah, it's a little inappropriate to deliberately make [S.B.] mad but that's about it."

On cross-examination, Defendant stated that he worked for the military police and as a police officer in Lafayette for seven years. When asked whether his "training in law enforcement" gave him "specialized knowledge as to things that are allowable and things that are not[,]" Defendant responded: "Yes, ma'am, I know the law." When asked why he thought he should not ride with a female juvenile alone but could ride with an adult female alone, Defendant replied: "Because of the law because if they're adults the conversation can go anywhere. It's perfectly legal." Defendant admitted that he made the "fingering" joke in front of Ms. Clark and Ms. Newman and stated that both girls laughed. Defendant denied telling S.B. and A.A. that he had sex with some of his students when they got older. Defendant agreed that he told S.B. and A.A. that one student wanted to have sex with him, but he refused because of her age. When asked why he would have sexual conversations with juveniles in his car, Defendant answered: "Because I didn't mean it as a sexual - - I didn't mean it that way. I mean, how often do you see a big old twelve foot rooster in somebody's yard so I pointed it out to them." Defendant denied talking about the victims' breasts although he

19

admitted to saying that he "told one she had no boobs but that's nothing sexual." He stated that everything the girls said were true, although they were mischaracterizing the conversations. Defendant denied having pornography on his phone although he admitted to looking at "[Tinder]."[4] When asked why he had the habit of tilting his phone to the right, Defendant answered: "Because they don't need to be seeing my phone in case something does pop up."

Defendant's mother, Connie Ardoin, testified for the defense. Connie advised that she had met many parents of the students that attended Defendant's driving school. She testified that after speaking with these parents, she was very proud of her son and understood he was a fine instructor. Finally, Connie testified that after speaking with Detective Cooley, she concluded that "one of the girls gave my son a telephone and [he] embarrassed her."

Ricky Romero, a patrol sergeant with the Eunice Police Department, testified that his minor daughters attended Defendant's driving school. When asked whether he received any complaints about services performed, Sergeant Romero stated: "Not at all[.]" Allana Miller, a former employee of Defendant, testified that she rode with Defendant during some of the driving instructions. Ms. Miller sat behind the student because there was more leg room. Ms. Miller testified that her location in the back seat prevented her from seeing Defendant's leg because of his big shoulders. Ms. Miller revealed that Defendant's crotch was not in her line of sight. On cross-examination, Ms. Miller claimed that she never heard Defendant talk about sex with a juvenile nor had Defendant ever talked about sex with her. When asked if she ever heard Defendant talk about sex with an old lady, Ms. Miller responded that "it depended on the person. If the person was talking nasty to him, he would go and talk nasty to that person."

---

[4] "Tinder" is a location-based mobile dating application.

The final witness to testify was Mr. Daigle, who was eighteen years old at the time of trial. According to Mr. Daigle, he was seventeen years old when he worked for Defendant in May 2015. He testified that during his employment, S.B. was going to perform sexual acts on him in the backroom until someone alerted others as to what they were about to do. Mr. Daigle revealed that S.B. asked him to switch her driving instructor so that she could drive with Defendant. On cross-examination, Mr. Daigle stated that S.B. told him she was fifteen years old at that time.

At the conclusion of the trial, the jury unanimously found Defendant guilty of two counts of indecent behavior with juveniles, a violation of La.R.S. 14:81(A)(2). At this juncture, we look to the legislative intent behind that statute. In that regard, the supreme court in *State v. Jones*, 10-762, pp. 8-9 (La. 9/7/11), 74 So.3d 197, 203, explained that by enacting Section (A)(2), the "legislature has expressed its intent to punish conduct that involves no more than a communication." When Jones committed his crimes in 2007, Section (A)(2) (emphasis added) made "it a crime to *electronically transmit* a lewd or lascivious message to a person reasonably believed to be a juvenile with the intent of arousing or gratifying the sexual desires of the perpetrator or the juvenile[.]" In 2009, the legislature "broadened the scope of subsection (A)(2) to include . . . '*oral communication.*'" *Id*. at 200, n.2 (emphasis added); *see* 2009 La. Acts No. 198 § 1. Thus, Defendant's oral communications with S.B. and A.A. satisfies the elements of indecent behavior with juveniles as long as the communication was made with the intent to arouse or gratify the sexual desires of either Defendant or the victims and the communication was "lewd or lascivious." La.R.S. 14:81(A)(2).

In *Jones*, 74 So.3d 197, the supreme court addressed whether Jones's graphic request to a teenage boy was sufficient to constitute attempted indecent

21

behavior with a juvenile under La.R.S. 14:81(A)(1). Thus, the holding of *Jones* is not wholly applicable to the present case. However, the discussion in *Jones* is helpful as to the pertinent issue before this court, i.e., whether Defendant's communication was lewd or lascivious and whether he possessed the requisite specific intent.

The court in *Jones*, 74 So.3d at 201, began its analysis by stating the following:

> [W]e have interpreted statutes dealing with sex crimes against children in light of the legislature's "protectionist" goal when drafting these statutes considering that "juveniles have been 'historically recognized as a special class of persons in need of protection . . .'" [*State v.*] *Fussell*, [06-2595 (La. 1/16/08), 974 So.2d 1223,] at 1234 (citing *State v. Granier*, 99-3511 (La. 7/6/00), 765 So.2d 998, 100). In enacting La.R.S. 14:81(A), the legislature intended the statute "to apply to behavior which falls short of intercourse [when] carried on with young children." *State v. Interiano*, [03-1760 (La. 2/13/04), 868 So.2d 9] at 15 (citing 1942 La. Acts 43 § 81 (Official Comment)). We have held that "the legislative history shows a compelling state interest in protecting children from the physical and psychological harm that can result from sexual acts committed 'upon the person' of the child and the psychological impact that having such acts committed in their presence may cause." *Id*. at 15-16.

The pertinent facts in *Jones*, 74 So.3d at 199, are as follows:

> J.D. testified that . . . he was visiting his girlfriend, L.S. . . . Defendant and L.S.'s uncle, Jerry Whatley, were sitting together in a bedroom of the home. Whatley is a transvestite who goes by the name of "Jaleesa." When J.D. came into the room, Whatley/Jaleesa asked J.D. to close the door and sit down on the bed. Whatley/Jaleesa then asked J.D. to show his hair, which J.D. and defendant both understood to mean his pubic hair, and J.D. refused and left the room. Sometime later, J.D. came back into the bedroom and asked defendant for a ride to the store, to which defendant replied "you can't get something for nothing." According to J.D., when he asked what defendant meant by that comment, defendant told J.D. he should put his penis in defendant's mouth. J.D. became offended, left the room, and told L.S.'s mother what defendant had said. She told him to call his own mother, which he did, the police were summoned and defendant was taken into custody.

Jones testified that he made the statement to J.D. in a joking manner, that he did not get sexually aroused by making the statement, and that it was not his intent

22

to get J.D. sexually aroused.  Finding there was sufficient evidence of Jones's

specific intent, the supreme court stated:

> While defendant testified that he made the request in jest and had no intent to arouse the victim or himself, clearly the jury rejected this testimony.  In addition to defendant's testimony, the jury also heard evidence that defendant was bisexual, that other teenage boys had alleged sexual misconduct by defendant, and that defendant made the statement while in the presence of a male transvestite who also made sexually suggestive and crudely inappropriate comments to the teenage victim.  Considering this evidence in the light most favorable to the prosecution, we find that a rational trier of fact could find the State proved beyond a reasonable doubt that defendant had the requisite specific intent to commit a lewd and lascivious act upon the teenage victim.

*Id*. at 201-02.

In defining lewd or lascivious, *Jones*, 74 So.3d at 200, n.1, states:

> This Court has previously defined "lewd and lascivious" in the context of La.R.S. 14:81(A) as an act which is "lustful, obscene, indecent, tending to deprave the morals in respect to sexual relations, and relating to sexual impurity or incontinence carried on in a wanton manner." *State v. Interiano*, 03-1760 (La. 2/13/04), 868 So.2d 9, 15; *State v. Holstead*, 354 So.2d 493, 498 (La.1977).  Oral sex with a juvenile victim would meet this definition.

The supreme court concluded that Jones's graphic sexual request was lewd and

lascivious and was made with the specific intent to arouse someone's sexual desire.

Since the law now provides that mere communication is sufficient to satisfy

the elements of indecent behavior with juveniles under La.R.S. 14:81(A)(2), there

need not be an act accompanying the communication in order for Defendant herein

to be found guilty of the crime.  However, we find that Defendant's "big white

cock" comment also involved an action on his part to actually show S.B. and A.A.

his penis.  Both juveniles testified independently that Defendant moved his hand

toward his crotch area while asking them if they wanted to see a "big white cock."

The comment with action constitutes an oral communication depicting lewd or

lascivious conduct.  Additionally, taken as a whole, Defendant's comments and the

presence of pornography within the confines of the car where the juveniles were under his instruction, constitutes lewd or lascivious conduct and words.

As for Defendant's specific intent to arouse or gratify his, S.B.'s, or A.A.'s sexual desires, we find that the evidence was sufficient to prove intent on his part. In *Jones*, 74 So.3d at 201, the supreme court stated the following:

> "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1); *State v. Ordodi*, 06-0207 (La. 11/29/06), 946 So.2d 654, 661. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *Ordodi*, *supra* at 661; *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297, 310, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006). The determination of whether specific intent exists is a fact question for the jury. *Ordodi*, *supra* at 661; *State v. Legrand*, 02-1462 (La. 12/3/03), 864 So.2d 89, 96, *cert. denied*, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005).

Considering Defendant's comments as a whole and his history of making blatant sexual comments and requests to other driving students, we find the jury rationally determined that Defendant possessed the specific intent to arouse his or the juveniles' sexual desires. Defendant's conduct with his then seventeen-year-old female student, Ms. Clark, and her friend, Ms. Newman, indicates that Defendant possessed a motive for sexual gratification rather than comedy. Obviously, the jury rejected Defendant's explanation that the communications to S.B. and A.A. were made in jest.

Accordingly, the evidence was sufficient to find Defendant guilty of both counts of indecent behavior with juveniles. This assignment of error is without merit.

### III.    Second Assignment of Error

In his second assignment of error, Defendant asserts he was deprived of his constitutional right to a fair trial by the introduction of improper other acts

24

evidence. The other acts evidence was the testimony of Ms. Clark and of Ms. Newman regarding comments made to them by Defendant while he was giving Ms. Clark driving lessons. These comments occurred in February 2015, a few months prior to the comments for which Defendant is charged. Defendant asserts this evidence was different than the charged offenses since the other evidence did not involve juveniles and was dissimilar to the charged offenses.

In opposition, the State contends the other acts evidence was presented to show Defendant's intent, to show that his behavior was not accidental or inadvertent, and to show that he had guilty knowledge. On December 19, 2016, the State filed a notice of intent to introduce the other crimes evidence at issue. At the end of the hearing, the trial court then issued the following ruling, finding the evidence admissible:

> First, I find the testimony of Bailey Newman and Marina Clark to be credible. The only thing, . . . defense counsel can point out is, they don't seem to be on the same page as to when they went to the police department, but everything else, according to my notes, that their two testimonies matches pretty good about exactly what took place. So, I find their testimony to be corroborative of each other and highly credible. That's number one. Number two, when looking at 404, certainly this evidence is prejudicial. If it wasn't prejudicial, we wouldn't have a procedure for us to come here today to determine whether or not the probative value outweighs its prejudice. That's the whole purpose, and every time I have one of these hearings, and I hear people tell me, it's prejudicial. Of course, it's prejudicial. The question is, does this probative value outweigh its prejudicial effect. I believe it does. I believe that this meets the criteria of 404. I believe this evidence is admissible for the purpose that it is intending, and let's remember, it's not intended to be admitted for the purpose of showing his character or any such other. It is a very limited purpose for which it will be admitted, and that can be addressed at the time of trial, but we have very, if not identical, situations. Do we have a difference between the age of Marina Clark and Bailey Newman, as compared to the two juveniles, barely, but yes, and legally, there's a difference. The two victims, at the time of the incidents for which we're here for Marina and Bailey, they were not considered minors or juveniles under our law. However, I do not believe that the difference is substantial enough to warrant ruling that this is inadmissible. For me to do so, would be to say, that I have a situation where someone is identified as having taken students into their vehicle and committed a

25

different crime, but used the opportunity to have students in their vehicle to commit that crime, but because some of the students are majors and some of them aren't, that we can't use it. I don't find that to be a determining factor in this case, at all. I find that although the argument is that the - - Ms. Clark and Ms. [Newman], not being minors were free to stop and leave. Everybody's free to stop and leave. Everybody's free to stop and leave. Even the juveniles were free to stop and leave, if they so choose to. I don't find, and I certainly don't find that a 17 year old girl put in this position, has the presence of mind to make those kind of decisions. I've never raised a girl. I've raised three boys, and I can assure you, when they were 18 or 19, they probably weren't in the mental capacity to make decisions of adults, even though they didn't agree with me when I made that call. I find that the evidence that the State seeks to use in this case meets the criteria of 404(B), and I rule that it is admissible at trial[.]

The supreme court has held that a "district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Taylor*, 16-1124, 16-1183, p. 18 (La. 12/1/16), 217 So.3d 283, 296.

Louisiana Code of Evidence Article 404(B)(1) provides:

Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In *State v. Kennedy*, 17-724, p. 2 (La. 9/29/17), 227 So.3d 243, 244 (footnote omitted), the supreme court stated the following regarding the introduction of other crimes evidence to prove intent:

If the element of intent is at issue, evidence of similar unrelated conduct is admissible to negate a defense theory that the accused acted without criminal intent and to show that he intended to commit the charged offense(s). La.C.E. art. 404(B). For evidence of a prior criminal act to be admitted as proof of intent, however, three prerequisites must be satisfied: (1) the prior act must be similar, (2) there must be a real and genuine contested issue of intent, and (3) the probative value of the evidence must outweigh its prejudicial effect. *State v. Kahey*, 436 So.2d 475, 488 (La. 1983).

26

In *Taylor*, 217 So.3d at 291 (emphasis in original), the supreme court stated the following regarding the State's burden of proving the commission of the other crimes evidence: "[W]e now recognize and hold that when seeking to introduce evidence pursuant to La.[Code Evid.] art. 404(B), the state need only make a showing of *sufficient* evidence to support a finding that the defendant committed the other crime, wrong, or act."

In *State v. Shelton*, 11-22 (La.App. 3 Cir. 9/28/11), 75 So.3d 512, *writ denied*, 11-2405 (La. 3/9/12), 84 So.3d 552, the defendant was convicted of manslaughter. In affirming the trial court's judgment, another panel of this court stated the following with respect to the introduction of other crimes evidence:

> Likewise, we reject [the defendant's] assertions that the photographs and other crimes evidence should not have been introduced. This evidence was very relevant as to motive, intent, preparation, plan, system and absence of mistake or accident. *See* La.Code Evid. art. 404(B) and *State v. Archield*, 09-1116 (La.App. 3 Cir. 4/7/10), 34 So.3d 434. We will not disturb the trial court's ruling as to the admissibility of such evidence in the absence of a clear showing of abuse of discretion. *State v. Scales*, 93-2003 (La.5/22/95), 655 So.2d 1326. We find no abuse of the trial court's discretion as the record reveals the evidence was very probative as to [the defendant's] actions regarding [the victim]. The facts surrounding [the victim's] death include many similarities with [the defendant's] other conviction for sexually assaulting a young male, and his photographing of other young males nude from the waist down, along with his victims, including [the victim in this case], being in drug induced states. The evidence is relevant and highly probative as to [the defendant's] motive, intent, and manner of carrying out his predatory sexual activities.

*Id*. at 522.

In the present case, we find that the trial court did not abuse its discretion in admitting the other acts evidence. As argued by the State, Defendant's intent is an element that must be proven in the present case. Defendant claims he had no specific intent to sexually arouse either himself or the juveniles and that his comments were only intended as jokes. Thus, Defendant's specific intent was

clearly at issue. The other acts Defendant committed against Ms. Clark and Ms. Newman were similar to the present offenses, i.e., in both situations the victims were taking driving lessons from Defendant. Additionally, in both situations, Defendant made sexual comments to his driving students. Thus, the other acts evidence showed Defendant's use of his position as driving instructor to make sexual comments to his students. Moreover, we find that the other acts evidence shows that Defendant's motivation was to sexually gratify himself rather than create a comedic atmosphere. We note that the slight difference in ages between the victims herein and Ms. Clark and Ms. Newman does not detract from this similarity. On the contrary, Defendant's knowledge that he could make more sexually explicit comments to the seventeen-year-old students indicates a malicious rather than playful intent on his part. Accordingly, the trial court did not abuse its discretion in finding the probative value of the other acts evidence outweighed its prejudicial effect.

For the foregoing reasons, this assignment of error lacks merit.

## IV.   **Third Assignment of Error**

In his third assignment of error, Defendant contends the trial court imposed an excessive sentence. The trial court sentenced Defendant to five years at hard labor on each count, to run concurrently with one another. Defendant was exposed to imprisonment on each count of up to seven years with or without hard labor as well as a fine of not more than $5,000. La.R.S. 14:81(H)(1). Defendant timely filed a motion to reconsider sentence, alleging the sentence was excessive when compared to the evidence presented to the jury.[5] After oral argument, the trial court denied the motion to reconsider.

---

[5] Defendant filed an amended motion to reconsider sentence in order to correctly reflect that the trial court ordered the sentences to run concurrently, not consecutively.

In *State v. Morain*, 08-1546, pp. 2-5 (La.App. 3 Cir. 6/3/09), 11 So.3d 733, 735-36, *writ denied*, 09-1670 (La. 4/30/10), 34 So.3d 282, this court set forth the following standard to be used in reviewing excessive sentence claims:

> [Louisiana Constitution Article I], § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

> *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-0838 (La.2/1/02), 808 So.2d 331 (alteration in original).

> In order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, we have held that:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-0562 (La.5/30/03), 845 So.2d 1061.

In *State v. Whatley*, 06-316 (La.App. 3 Cir. 11/2/06), 943 So.2d 601, *writ denied*, 06-2826 (La.8/31/07), 962 So.2d 424, we discussed the factors that a reviewing court should consider in determining if a trial court abused its discretion in imposing a sentence. In *Whatley*, citing *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-0433 (La.6/25/99), 745 So.2d 1183, we annunciated three factors that a reviewing court should take into consideration in abuse of discretion cases: (1) the nature of the crime; (2) the nature and background of the offender; and (3) the sentence imposed for similar crimes by the same court and other courts.

In this case, the trial court gave the following reasons for the sentences imposed:

The Court has considered these matters, as well as the nature of the two offenses, for which the defendant was found guilty, as well as the provisions of Article 894.1 of the Code of Criminal Procedure relative to Sentencing Guidelines. The Court makes note of the following: The defendant was approximately forty-five years old at the time of these offenses. The defendant knew that the victims of these crimes were young girls of tender years, and I've considered the impact that this must have had upon these young girls. The Court also makes note of the fact that the defendant has consistently shown a complete lack of remorse for what has taken place here. In fact, he has testified that he believes he has done absolutely nothing wrong. I am particularly moved by the defendant's testimony at this trial, particularly his testimony that he knew where to draw the line; it was okay to talk dirty to seventeen and eighteen year old girls, but he didn't do it with fifteen and sixteen year old girls. He testified that, because of his experience in law enforcement, he knew the law. That's exactly what he testified to. He used his position of authority over young girls to prey upon them. There was testimony at trial that he did it to other students, whether they were juveniles or not, they were seventeen and eighteen at the time and he was forty-five. The offense of indecent behavior with a juvenile is a heinous crime. It involves the use of innocent children to satisfy the sexual desires of an adult and requires the commission of a lewd or lascivious act upon or in the presence of a child. Clearly, society finds such activity inexcusable. It is most concerning to this Court that this defendant has steadfastly maintained that he has done absolutely nothing wrong with any children, despite the evidence clearly indicting otherwise. He was in fact viewed as a respected driving instructor at the time. He even went one step further and placed his brochures in the schools, so that parents could rely on the fact that it appeared that a school was in fact recommending this driving instructor. It is my belief parents believe that they can rely on the schools, as actually recommending this driving instructor for their

children. These charges are very serious by the very nature of them, but also because of the trust that the defendant has violated, not only with these victims and their families, but also with his family and the community as a whole. A unanimous jury, as well as this Court, was convinced beyond a reasonable doubt that the victims' testimony was truthful, and that the defendant actually committed these lewd and lascivious acts in the presence of these young girls, in order to arouse his own sexual desires, and that he used his position of control or supervision to accomplish these acts. The harm done to these victims is inconceivable and unimaginable to me, and I find that that harm is only compounded by the fact that the defendant has shown absolutely no remorse. Further, the evidence was clear that this defendant had a pattern of doing this, based upon the evidence presented at trial from two other young girls, all be [sic] them not considered juveniles, seventeen and eighteen. It is the belief of this Court, after taking all of this into account, that there is an undue risk that if the defendant were to receive a probated sentence, that he would commit another crime. I find that this defendant is in need of a custodial environment that can best be provided and be provided most efficiently by his commitment to a penal institution. The evidence is that this defendant may have developed a pattern, which must be changed if he is to live in this society. As a result, the Court hereby sentences the defendant to serve five years at hard labor on each of the two counts of indecent behavior with a juvenile, for which he was convicted. The Court finds that a lesser sentence would deprecate the seriousness of the defendant's crimes. I do find, however, that the offenses were as a result of one common occurrence that happened at the same time, despite there being two victims present. As a result, the sentences shall run concurrent to each other.

The trial court also advised Defendant that he will be required to register as a sex offender for fifteen years after his release from incarceration. At the subsequent hearing on the motion to reconsider sentence, the trial court denied the motion and stated:

I looked at, solely, the evidence that was presented in this case. I sat through it, along with you, Ms. Gothreaux and the jury. I had a unanimous jury convinced of it, and as I said at sentencing, I was very impressed by the evidence that came out. I was impressed, also by the - - what I viewed and I still view as a complete lack of remorse by the defendant. I viewed it to be significant that the defendant was in a superior position to the victims in this crime, and was in a position of authority over them during the time, thereby violating that authority at the time that these acts were done; and you mentioned three things, and there was a lot more than three things that were put on in evidence. All of which, obviously which ones, we don't know which ones the jury seized upon. They were all presented, and the jury found the defendant guilty. Therefore, I then looked at this case. I looked as I

31

told you, and I told you this face to face. I looked at all the cases I could find on sentencing for this very crime, this very statute, and had it been my druthers, and I didn't have to look at what the Court of Appeal thinks is reasonable or not, me, personally, I would have given him the maximum on both. That's what I would have done, but I looked at the case law, because I know that the legislature has acted before, and I read it to determine what I thought would be a reasonable sentence in light of the evidence that was presented, and I find that the evidence was, in fact, such that the sentence that I imposed was reasonable and yes, he gets a bond because the legislature didn't give me the discretion if the sentence I imposed does not exceed five days [sic]; and yes, I could take this opportunity, based upon you having filed a motion for me to reconsider, to say that I'm going to change the sentence, and I'm going to make sure that the total sentence is five years and one day, and I'm going to revoke his bond, and he's going to jail until this is over with. I'm not going to do that. I have made a decision. I thought my decision was reasonable under the circumstances. I still think my decision was reasonable under the circumstances. Motion to [Reconsider] Sentence is denied.

In brief, Defendant argues that in light of the mitigating factors he argued at the sentencing hearing, the sentences imposed are excessive. He asserts that while his comments were distasteful, they were intended to be in jest. Defendant claims that the evidence presented shows that he never threatened to physically touch the victims and never made any sexual advances suggesting he was a sexual predator.

In response, the State argues the trial court gave much thought to the sentences imposed and particularized them to Defendant. The State repeated the aggravating factors it argued at the sentencing hearing and stated that the sentences imposed were proportionate to the crimes committed.

We find that the trial court gave ample reasons for the sentence imposed. To make a decision as to whether the trial court abused its discretion, a comparison of other cases is necessary. *See Morain*, 11 So.3d 733. In *State v. Hebert*, 50,163 (La.App. 2 Cir. 11/18/15), 181 So.3d 795, the defendant pled guilty to five counts of indecent behavior with a juvenile, in violation of La.R.S. 14:81(A)(2), and was sentenced to two years at hard labor on each count, to run consecutively. Hebert sent numerous sexually explicit photographs and messages to a party he believed

to be a fourteen-year-old girl. Hebert's history showed his active involvement in similar acts with minors and other undercover officers in another jurisdiction. The second circuit found the sentences were not excessive, noting Hebert's sentence exposure was greatly reduced by his guilty plea.

In *State v. Yates*, 44,391 (La.App. 2 Cir. 7/1/09), 15 So.3d 1260, *writ denied*, 09-2096 (La. 8/18/10), 42 So.3d 398, the defendant was convicted of indecent behavior with a juvenile, a violation of La.R.S. 14:81(A)(2), and sentenced to the payment of a $1,000 fine and imprisonment of five years at hard labor, all but three years suspended, with three years of probation. Yates engaged in an internet chat room conversation with a detective pretending to be fifteen-year-old girl. The conversation turned sexual and was in violation of the statute. Yates's computer was seized during a search of his house and pornographic pictures were seized from the computer, some of which bordered on child pornography. Yates claimed his sentence was excessive considering his lack of prior convictions, the lack of physical injury to any person, and the lack of any physical contact with any person. Yates had a prior arrest for child pornography. The second circuit found Yates's sentence was not excessive.

There is little jurisprudence directly on point since the crime of indecent behavior with juveniles was not expanded to include traditional verbal communications until 2009. We are mindful, however, of the legislative intent behind the enactment of Section (A)(2), which is to "punish conduct that involves no more than a communication." *Jones*, 74 So.3d at 203. Although Defendant has no prior convictions and did not physically touch the victims herein, the evidence shows that he used his authoritative position to prey on them. The evidence further reveals a history of preying on other girls. Defendant's own testimony reveals that, because of his experience in law enforcement, he knew the law and how to avoid

33

its application. Most importantly, Defendant exhibited a complete lack of remorse during trial. As noted in the trial court's reasons, "A unanimous jury, as well as [the trial court], was convinced beyond a reasonable doubt that the victims' testimony was truthful, and that the defendant actually committed these lewd and lascivious acts in the presence of these young girls, in order to arouse his own sexual desires, and that he used his position of control or supervision to accomplish these acts." Thus, we find that the trial court did not abuse its discretion by imposing a sentence of five years at hard labor on each count of indecent behavior with juveniles, to run concurrently with one another.

For the foregoing reasons, we find that Defendant's sentences are not excessive, and this assignment of error is without merit.

## CONCLUSION

The trial court's convictions and sentences are affirmed.

**AFFIRMED.**